HENRY Y. ATTRILL *vs.* ABRAHAM B. PATTERSON.
ABRAHAM B. PATTERSON *vs.* HENRY Y. ATTRILL.

*Pleading—Bill of Particulars—Special Contract—Principal*
*and Agent—Agent's authority;—when not revocable—Author-*
*ity Coupled with an Interest—When Agent entitled to his*
*Commissions—Contract to negotiate a Compromise—Compen-*
*sation dependent on Success—Quantum meruit—Remittitur.*

A. B. P. sued H. Y. A. The declaration contained only the six
money counts. On demand of the defendant, the plaintiff fur-
nished the following bill of particulars :

" To services rendered by the said A. B. P. at the request of said H.
Y. A. between the first of September, 1873, and the ninth of April,
1875, in aiding to procure a compromise between the Crescent City
Gas Company of the State of Louisiana, and the New Orleans Gas.
Light Company of the said State, which compromise resulted in
an agreement of consolidation or amalgamation between said two.
companies; $50,000.00." HELD :

That while the bill of particulars, furnished on demand, became a
part of the declaration, it contained none of the elements of pre-
cision and stipulation belonging to a special contract, or to a count
in a declaration, setting one out; it could only be regarded as a
simple specification of the kind of service rendered, for which
compensation was sought, and the charge which the plaintiff made
therefor.

As a general rule, an agent's authority to act for his principal is
always revocable at the will of the principal; and may be termi-
nated at any time by its withdrawal, unless it be coupled with an
interest; or has been conferred on the agent for a valuable com-
pensation moving from him to the principal.

To render an agent's authority, though coupled with an interest,
irrevocable, the interest must be an interest in the thing itself on
which the authority is to be exercised, and not an interest in that
which is to be produced by the exercise of the authority.

### Attrill *vs.* Patterson.

To entitle an agent to his commissions, he must be the *procuring cause* of the consummation of the transaction, whatever it may be; and this is a matter of proof.

The plaintiff claiming to have been employed by the defendant at the stipulated sum of $50,000, to aid in bringing about a compromise between the New Orleans Gas Light Company and the Crescent City Gas Light Company—two gas companies in the City of New Orleans—instituted suit to recover said sum as compensation for his services in securing such alleged result. The relations of the two companies were such as to make it very desirable to settle, if possible, their conflicting claims by the purchase of the works of the old company—the New Orleans Gas Light Company—by the new—the Crescent City Gas Light Company—or by the sale by the new company of its charter rights to the old; or by some kind of compromise to end the controversy. The defendant having acquired a controlling interest in the stock of the new company, employed the plaintiff in September, 1873, to go to New Orleans to negotiate for him, if possible, a *compromise* of the conflicting claims of the two companies. The plaintiff went, and after spending several months in fruitless endeavors to secure an amicable adjustment, the defendant concluded to abandon all efforts to compromise, and to resort to regular legal proceedings. Legal proceedings were thereupon instituted, the result of which was an amalgamation of the two companies on the 29th of March, 1875, under a general law of the State of Louisiana authorizing such consolidation. It was insisted by the defendant that as soon as he resolved to test his rights through the Courts, the plaintiff's connection with the matter ceased; that having failed to accomplish what he was employed to do, he was discharged. The plaintiff, on the other hand, contended that he was authorized to initiate the legal proceedings; that they were a part of his planning, and the result of his advice to the defendant; that he was retained as agent in the matter after the legal proceedings were begun; and that the defendant could not discharge him without paying him the compensation agreed upon in the event of a "good compromise" being effected, which he insisted had been accomplished by the amalgamation of the two companies after the suit terminated in the defendant's favor. Before the institution of the suit the plaintiff was directed to close negotiations and to meet the defendant in St. Louis. From the institution of the suit to its successful termination, the plaintiff had been wholly ignored, had been excluded from the counsels of the lawyers and those interested in the matter, and never participated again in any way. HELD:

1st. That it was clear that the contract under which the plaintiff started for New Orleans, contemplated nothing but the negotiation of a *compromise* between the two companies, whereby a resort to legal proceedings was to be avoided; and it was only in the event of his effecting or aiding to effect " a good compromise," that he was to have the sum stipulated for as compensation.

2nd. That having failed to procure the compromise, he was not entitled to the stipulated compensation.

3rd. That if after the failure of efforts to compromise, the plaintiff was detained away from his home in New Orleans, or St. Louis, by any device of the defendant, and did anything for the defendant in the execution of a special authority, he was entitled to recover what the time so occupied, and the services so rendered, were reasonably worth.

Where the amount of damages laid in the declaration is $50,000, and the same amount is claimed in the bill of particulars, and a verdict is rendered for $67,000, the Court is justified in requiring the plaintiff to remit the excess of the verdict over the damages claimed, or submit to have the judgment arrested and a new trial granted.

APPEALS from the Court of Common Pleas.

*Exception.*—The case being closed on both sides, the plaintiff offered three prayers, the third of which was conceded; the others are as follows:

1. That if the jury find from the evidence that the defendant employed the plaintiff in September, 1873, to go to New Orleans, as agent of the defendant, to take such measures as the plaintiff might deem judicious and expedient, to bring about an arrangement or compromise between the New Orleans Gas Light Company, and the Crescent City Gas Light Company, which would result in a pecuniary benefit to the defendant, as a holder of the stock of the said Crescent City Gas Light Company, and agreed to pay said defendant for his services, provided good arrangements or compromise should be effected between said companies, and to pay his expenses, while plaintiff was so engaged; and if they further find, that

in pursuance of said employment, the plaintiff proceeded to New Orleans, and remained there, as shown in the evidence, engaged in trying to effect such an arrangement; and if the jury shall further find, that while the plaintiff was so engaged in endeavoring to bring about an arrangement or compromise between said companies, he came to the conclusion that such an arrangement as the defendant desired to effect, could be best, or more certainly effected by litigation, in order to obtain a judicial decision of the legal rights claimed by each of said companies; and if they shall further find, that the plaintiff communicated his said conclusion to the defendant, and advised and urged the defendant to resort to litigation for the purpose aforesaid, and persuaded the defendant to consent to such litigation; and that the plaintiff was thereupon authorized by the defendant to employ counsel for that purpose, and to cause such litigation to be instituted; and that he did cause counsel to be retained to institute such proceedings, and directed that the said proceedings be instituted; and if they further find, that subsequently, the defendant summoned the plaintiff to St. Louis, to confer with defendant, and his counsel, Mr. Gibson, about the matter of said litigation, and that the plaintiff went to St. Louis and conferred with Mr. Gibson, and laid before said Gibson all the information said plaintiff had acquired in New Orleans, as to the history of the negotiations between the companies, and as to the views of counsel retained in New Orleans, as to the legal measures that were to be undertaken; and if they further find that afterwards the defendant required the plaintiff to return to New Orleans with him, to be present when Mr. Gibson should go to New Orleans in connection with said litigation; and if they further find that plaintiff did whatever he could do to aid in said litigation; and if they further find that until the counsel employed, had finally agreed as to the form of the proceedings to be taken, and said proceedings

Attrill *vs.* Patterson.

were about to be taken, the defendant had continued to treat the plaintiff as his agent, and had not in any way informed the plaintiff that the defendant intended to discharge the plaintiff as his agent, then the plaintiff continued legally to be the agent of the defendant, and entitled to the rights of such agent under such agreement as the jury may find to have existed between them, up to and until such time as the jury may find the defendant notified the plaintiff, that he, the defendant, would no longer accept the services of the plaintiff.

2. That if the jury find the facts set forth in the plaintiff's first prayer; and if they further find that the litigation mentioned in that prayer was instituted and prosecuted, and that the result of it was to induce the New Orleans Gas Light Company to make the arrangement or settlement shown in the evidence, and that said settlement was a settlement in accordance with the wishes of, and satisfactory to the defendant, and more advantageous to him than such settlement between said companies, as the jury may find that defendant himself had proposed to make before resort was had to litigation as aforesaid, then the plaintiff is entitled to recover such compensation for his services as the jury may find the defendant agreed to pay him, in the event of a good compromise between said companies being effected, with interest as the jury may allow, provided that they find that the plaintiff, in good faith, gave his best exertions to serve the defendant until discharged by him.

The defendant filed the following exception to the plaintiff's first prayer:

"Defendant objects to the plaintiff's first prayer, because it asks the jury to find that the plaintiff did whatever he could to aid in the litigation, in regard to which Gibson went to New Orleans, whereas, there is no evidence in the case that he could, or did do, anything in reference to the same."

The defendant then offered the following prayers:

1. That the authority conferred on the plaintiff, by the defendant, to proceed to New Orleans, and act as his agent, by the agreement of September, 1873, as testified to by the plaintiff, was an authority revocable in law, and that the defendant had the right at any time, at his pleasure, to withdraw such authority and put an end to the employment and agency of the plaintiff, subject to his proper legal responsibility, (if any,) to the plaintiff, should such revocation be found to be wrongful by the jury, under such instructions as the Court may see fit to give upon that point.

2. That the compensation which the plaintiff was to receive for his services, under said agreement of September, 1873, being, as testified to by the plaintiff, a contingent compensation, the plaintiff is not in any event entitled to recover said compensation, or any part thereof, under said agreement, unless the contingency, which was to determine his compensation, actually happened, and was brought about, in whole or in part, by the services which he was employed under said agreement to render.

3. If the jury shall find that the plaintiff was employed by the defendant in September, 1873, and himself contracted to proceed to New Orleans, as agent of the defendant, to bring about a compromise between the Crescent City and New Orleans Gas Companies, by amicable negotiation only, and for the express purpose of avoiding litigation; and shall further find, that by the terms of said employment, the plaintiff's compensation was wholly contingent upon his bringing about such amicable compromise, without litigation, and that he altogether failed so to do, the plaintiff is not entitled to recover the said compensation, or any part thereof, under the said agreement.

4. Even if the jury should find, that at any time after the arrival of the defendant in New Orleans, and after the failure of the plaintiff to bring about an amicable com-

promise, (if the jury shall find such failure,) the defendant continued the plaintiff in his employment as his agent, to look after and protect his interests, with full power to act as he might see fit, in regard to the same, and to consult or employ counsel, and initiate litigation, with the view, and for the purpose of bringing about a compromise between the two. gas companies, the further agency and authority so given to the plaintiff, were, in law, revocable by the defendant, and he had the right to terminate the same at any time, and discharge the plaintiff from his employment at his pleasure, subject to his proper legal responsibility (if any) to the plaintiff, should such revocation be found to be wrongful by the jury, under such instructions as the Court may see fit to give upon that point.

5. If the jury shall find, that prior to the 10th of January, 1874, defendant, finding that plaintiff's efforts in New Orleans, had produced no fruits down to that time, directed him to close negotiations by January 10th, 1874, and that plaintiff did so, and advised defendant to that effect; and shall further find, that the defendant, being discouraged, and depressed, and reluctant to proceed any further in the matter, and having "practically given up his case," as testified by the plaintiff, determined in good faith, to consult, and did consult Mr. Gibson, of St. Louis, as to his legal rights and remedies, and to abandon his said rights altogether, or assert them at law, as Mr. Gibson might advise; leaving his future action to be determined by Mr. Gibson's judgment, which determination of Attrill, Patterson was made aware of and acquiesced in, and that Attrill, with a view to such consultation, summoned the plaintiff to St. Louis, about the middle of January, 1874, to lay such facts and information as he possessed in the premises, before Mr. Gibson, which Patterson accordingly did; and if the jury shall further find, that Mr. Gibson gave the defendant a decided and favorable

opinion as to his (     and advised him that, in his opinion,
certain proceeding     _ght be successfully instituted for the
enforcement of his  .  hts, and was employed by Attrill,
with Patterson's knowledge and acquiescence, to proceed
to New Orleans in February following, to consult with
Mr. Randolph there, (upon Gibson's suggestion,) as to the
conformity of the proceeding, by him suggested, with the
local law, and did so consult, and that Mr. Randolph and
Judge Dibble, who was also brought into consultation, (if
the jury so find,) agreed with Mr. Gibson in opinion, as to
the rights of said Attrill, and the proper mode of asserting
them at law, and that all of said counsel united in advis-
ing Attrill to abandon further negotiations as not only
futile, but disadvantageous, and advised the institution of
a new suit, (in the form advised by Mr. Gibson,) in the
name of the Crescent City Gas Light Company, directly
against the N. O. Gas Light Co., and urged the prosecu-
tion of the same to a judicial termination, and a judicial
ascertainment as to the respective rights of the two com-
panies, without further attempt at compromise, pending
the same; and if the jury further find, that said Attrill,
in good faith, accepted said opinion of counsel, and acted
thereupon, and would have abandoned his interest and
claims, but for such opinion, and that said suit was brought
by said counsel, under Attrill's own direct employment on
the 14th day of February, 1874, and, after an unfavorable
judgment in the lower Court, was prosecuted on appeal
adversarily and without any attempt at negotiation or
compromise whatever, to a successful termination in the
Supreme Court of Louisiana, and that by a judgment of
that Court, rendered on the first day of February, 1875,
the pretended extension of the charter of the old gas com-
pany, by the Act of 1860, was pronounced null and void,
and all the claims and pretensions of the Crescent City
Gas Light Company, and of Attrill, were sustained and
confirmed; and if the jury shall further find that by and

in consequence of said decision of the Supreme Court of Louisiana, the old gas company was forced into consolidation or amalgamation with the Crescent City Company, which is in evidence, and that the negotiations therefor were not begun until after the rendition of said judgment, and were conducted by said Attrill alone, and directly with the officers of the old company, without any participation of the plaintiff, or in said suit, or the directions therefor, or institution thereof, or in said negotiations, and that the plaintiff was dismissed from the employment of said Attrill, in February, 1874, before or at the time of the institution of the suit last mentioned, and had received the letter of said Attrill, of September 8th, 1874, directed to Mr. Roberts, at the time it was written, the plaintiff is not entitled to recover in this action.

5½. If the jury believe the testimony of Mr. Gibson, as to what took place in St. Louis, in respect to the matters in controversy here, and as to Mr. Gibson's employment by Mr. Attrill, to proceed to New Orleans, and the objects and purposes thereof, and that the plaintiff was privy to the said employment of Mr. Gibson, and to the circumstances, objects and conditions thereof, and made no objection of any sort, to the same; and if the jury shall further believe the testimony of Mr. Gibson, as to what took place in New Orleans, in pursuance of his engagement by Attrill, at St. Louis, and as to the subsequent consultations, conclusions and advice of counsel at New Orleans, and the institution of the suit of February 14th, 1874; and if the jury shall further believe that the defendant submitted himself altogether, as testified by Mr. Gibson, to the advice of his said counsel as to the whole matter, and his future course in respect to the same, and did so in good faith, and acting thereupon, employed the said counsel to institute and prosecute the said suit of February 14th, 1874, for the purposes testified to by Mr. Gibson, and immediately after receiving the said opinions

Attrill *vs.* Patterson.

and advice of his said counsel in New Orleans, dismissed the plaintiff from further employment, as his agent in the matter, the said dismissal was not wrongful, and the plaintiff cannot recover in this action.

6. That even if the jury find, that the defendant, on learning the rejection of his proposals by the New Orleans Gas Company, in December, 1873, was disheartened and discouraged, and disposed to abandon and sacrifice his entire interest in the Crescent City Gas Light Company, and was encouraged, persuaded and induced by Patterson and Herron (as testified to by Patterson,) to take courage, and adopt the policy of litigation, such encouragement, persuasion and inducement on the part of Patterson, do not entitle him to recover anything in this case, even if the jury believe that he took all the steps in regard to litigation, to which he has testified, before leaving New Orleans, in January, 1875; provided, the jury further find the facts set forth in the defendant's fifth, and fifth and a half prayers.

7. If the jury shall find the facts set forth in defendant's fifth, and fifth and a half prayers, plaintiff is not entitled to recover, even if the jury shall find that Attrill continued Patterson in his employment, after the failure of amicable negotiations, (if the jury shall find such failure,) down to the time of his dismissal in February, 1874, (if the jury find such dismissal,) and that said employment was on the terms and footing as to compensation, of the agreement of September, 1873, and that said Patterson had, besides all the authority as to litigation, to which he has testified that said Attrill conferred on him, and did all the acts in regard to litigation, to which he has testified.

8. If the jury shall find that Attrill took Patterson to New Orleans, in February, 1874, in continuation of his previous employment and agency, Patterson is not entitled to recover in this case, if the jury find the facts set forth in defendant's fifth, and fifth and a half prayers.

9. If the jury should find that Attrill took Patterson to New Orleans, in February, 1874, ostensibly in the continuation of his previous agency and employment, but in reality for other reasons not disclosed to Patterson, and the Court should be of opinion and instruct the jury, that Patterson is entitled to recover anything on that account, the measure of his recovery is what the jury shall find to be a fair compensation for his time, labor and services away from his home and business, from the time of leaving Baltimore till his return thereto; provided, the jury shall find the facts set forth in defendant's fifth, and fifth and a half prayers. And in determining Patterson's said compensation, the jury must take into consideration the admitted fact, that all his travelling and other expenses were paid by Attrill.

10. That there is no evidence in the cause of the wrongful dismissal of the plaintiff by defendant from his agency or employment, or of any wrongful interference with plaintiff by defendant, in the exercise of any rights conferred on the plaintiff by his said agency or employment.

11. That there is no evidence in the cause that the favorable result of the controversy between the Crescent City Gas Light Company, and the New Orleans Company was brought about in whole or in part, by any service, participation or assistance of the plaintiff entitling him to compensation.

12. That if the jury shall find that the defendant dismissed the plaintiff from his employment and agency, in February, 1874, before or about the time of the institution of the proceedings of February 14th, in New Orleans, or afterwards, and that such dismissal was a breach of the agreement between the parties, the plaintiff is still only entitled to recover such compensation as the jury may deem adequate for his time, labor and services down to such dismissal, and that the contingent compensation agreed upon in September, 1873, is not in law binding

upon the jury as the measure of plaintiff's recovery in this action.

The Court (BROWN, J.,) granted the first and second prayers of the plaintiff; the third was conceded by the defendant. The second prayer of the defendant was conceded by the plaintiff. The Court granted the first and fourth prayers of the defendant "subject to the instructions given by the Court in the first and second prayers of the plaintiff," and rejected the other prayers of the defendant.

To the granting of the plaintiff's first and second prayers, the defendant excepted, as also to the rejection of his own fourth, fifth, fifth and a half, sixth, seventh, eighth, ninth, tenth, eleventh and twelfth prayers respectively; he also excepted to the rejection of his first and third prayers as offered and to the granting of them "subject to the instructions given by the Court in the first and second prayers of the plaintiff."

The verdict and judgment being for the plaintiff the defendant appealed.

The amount of damages laid in the declaration was $50,000. The same amount only was claimed in the bill of particulars. The verdict was for "$67,000, being $50,000 principal, and $17,000 interest thereon." The defendant thereupon filed a motion for a new trial, and also in arrest of judgment, the latter motion being based on the excess of the verdict over the damages claimed, and the plaintiff moved the Court for judgment on the verdict. The Court overruled the plaintiff's motion, and ordered that the judgment should be arrested, and a new trial granted (on account of the excess named and for no other cause) unless the plaintiff should remit, and take judgment for $50,000. The plaintiff protesting, remitted the excess, and took judgment for $50,000, reserving nevertheless, and taking, his appeal from the action of the Court in the premises.

The cause was argued before BARTOL, C. J., STONE, MILLER, ROBINSON and IRVING, J.

*Severn Teackle Wallis*, and *I. Nevett Steele*, for Attrill.

*Bernard Carter*, *Charles Marshall*, and *William A. Fisher*, for Patterson.

IRVING, J. delivered the opinion of the Court.

There are two appeals in this record which will be disposed of in one opinion.

Abraham B. Patterson sued Henry Y. Attrill in the Baltimore City Court, and, by consent of parties, the case was transferred to the Court of Common Pleas. The declaration is in the usual form upon the six money counts. The following bill of particulars was filed, in response to a demand made by the defendant:

"Henry Y. Attrill to Abraham B. Patterson, Dr.
"To services rendered by the said Patterson, at the request of said Attrill, between the first of September, 1873, and the 9th of April, 1875, in aiding to procure a compromise between the Crescent City Gas Light Company of the State of Louisiana, and the New Orleans Gas Light Company of the said State, which compromise resulted in an agreement of consolidation, or amalgamation between said two companies............................................ $50,000.00."

The defendant pleaded never indebted, and did not promise as alleged.

The plaintiff contends, that the bill of particulars, furnished on demand, becomes a part of the declaration, and makes this declaration contain a count upon a special contract. The bill of particulars does become a part of

the declaration; but, as furnished in this cause, it contains none of the elements of precision and stipulation belonging to a special contract, or a count in a *narr.*, setting one out. It can only be regarded, as its plain language imports, as a simple specification of the kind of service rendered for which compensation is sought, and the charge which the plaintiff makes therefor. It does not set out in terms, nor by implication, that the sum charged was a sum agreed to be paid for the services designated. The amount charged is identical with the amount claimed in the declaration, before the bill of particulars was filed. As a part of the pleading therefore, we cannot regard it as setting up a special contract.

The appellee, Patterson, claims to have been employed by Attrill (the appellant) to aid in bringing about a compromise between two gas companies in the City of New Orleans, and to a proper understanding and appreciation of the questions presented, it is important to see what the subject of controversy, between the two companies, was.

"The New Orleans Gas Light Company," by virtue of a charter, granted by the Legislature of Louisiana in (1835) eighteen hundred and thirty-five, was supplying the City of New Orleans with gas. By its charter it possessed the exclusive privilege of making and vending gas, in the City of New Orleans, for a period of forty years, which would expire on the first day of April, 1875. In 1860 an Act of the Legislature of Louisiana was passed, with the title of "An Act to extend the area of gas lighting in the City of New Orleans, and to reduce the price now paid by consumers." This Act contained a section extending the charter of the New Orleans Gas Light Company to the first day of April, 1895, but declaring its privileges should cease to be exclusive after the first day of April, 1875; which was the limit of its existence by its original charter.

In 1870 "The Crescent City Gas Light Company" was incorporated by the Louisiana Legislature; and in 1873 certain amendments were made, by the Legislature, in its charter. To this new company was granted the monopoly of making and vending gas, in the City of New Orleans, from, and after the first day of April, 1875.

The Crescent City Gas Light Company claimed, that the Act of 1860, whereby the charter of the New Orleans Gas Light Company was granted an extension of their charter, for twenty years longer, with the privilege of making and vending gas, (though not exclusive after April 1st, 1875,) was unconstitutional and void, by reason of certain provisions in the Constitution of Louisiana respecting the form and contents of the title of Statutes. If this position of the Crescent Gas Light Company was correct, the New Orleans Gas Light Company would cease to have corporate existence on the first day of April, 1875; and from that day the "Crescent City Gas Light Company" must supply the city with gas. The New Orleans Gas Light Company was fully equipped to afford the supply. If its existence ended on the first day of April, 1875, the new company must put itself into condition to fulfil the requirements of its charter after that date. An immense outlay was necessary which it was dangerous to encounter unless the claim to monopoly was assured by some judicial decision; whilst the other company had its mains, pipes and appliances all ready and in constant use. It was desirable therefore, if possible, to settle these conflicting claims by purchase of the works of the old company by the new, or the sale by the new, to the old company, of their charter rights; or by some kind of compromise which would end the controversy. The defendant, Attrill, having acquired a decidedly controlling interest in the stock of the "Crescent City Gas Light Company," in September, 1873, employed the plaintiff, Patterson, to go to New Orleans to negotiate for him,

if possible, a compromise of these conflicting claims of
the two companies.   He went; and after remaining sev-
eral months in fruitless endeavors to secure an amicable
adjustment, his principal, Attrill, concluded to abandon
efforts to compromise and to resort to regular legal
proceedings.   Attrill insists, that so soon as he re-
solved to test his rights at law through the Courts,
Patterson's connection with the matter ended; that hav-
ing failed to accomplish what he was employed to do,
Patterson was discharged, whilst Patterson contends that
he was authorized to initiate the legal proceedings; that
they were a part of his planning, and the result of his
advice to his principal; that he was retained as agent in
the matter after the legal proceedings were begun; and
that Attrill could not discharge him without paying him
the compensation agreed upon in the event of a good
compromise being effected; which he contends has been
done by the amalgamation of the companies, after the
suit terminated in Attrill's favor.   The legal proceedings
resulted in the overthrow of the New Orleans Gas Light
Company's claim to extension of charter rights after the
first day of April, 1875; and in the issuance of an order
of Court restraining that company from any attempt after
that date to exercise any of their former privileges; and
inhibiting it from interfering with, or impeding in any
way, the Crescent City Gas Light Company in the exercise
of the exclusive privileges secured by their charter, after
the first day of April, 1875.   This being a decision of
the Supreme Court of the State, rendered February 1st,
1875, only two months before the New Orleans Gas Light
Company would cease to have corporate existence, it put
that company at the foot of the Crescent City Company,
which, rather than construct, would prefer some arrange-
ment by which the works, mains and pipes of the old
company should continue to be used; whilst the old
company would willingly and wisely sacrifice much to

save anything for their stockholders, from their works, which would otherwise be comparatively worthless.

The outcome of it all was an *amalgamation* of the two companies on the 29th of March, 1875, under a general law of the State authorizing such consolidation, which was passed by the Legislature the December preceding; by which agreement the consolidated company retained the name of the "New Orleans Gas Light Company," and all the franchises of the Crescent City Company were conferred upon it; and a certain amount of paid up stock of the newly organized company· was issued to Attrill, (the defendant,) as the representative of the stock-holders in the Crescent City Company, in lieu of the stock of that company, the certificates of which were cancelled.

Having given as concise a history of the origin of this. suit as we could, to make it perfectly intelligible, we must consider, to some extent, the proof with respect to the contract which we are to construe, and give effect to, according to the rules of law which we find applicable. And inasmuch as the appellee was entitled to have the jury consider his evidence of what the contract was, as the possible basis of their verdict, we shall assume for the purposes of this decision, that the conversation, in which the contract was made, and which, in fact, was the contract, was exactly what he represents it to be.

Awhile prior to the fifteenth of September, 1873, Patterson says, Attrill told him "he should want his services, and to hold himself in readiness;" to which he replied "very well." About the 15th or 20th of the same month, Patterson testifies that Attrill said to him he was "prepared to talk;" and to his inquiry "what is it?" Attrill replied, "It is a similar transaction to the one you carried through here." I want you to go down to New Orleans to make a negotiation there; I have possessed myself of a majority of the stock of the Crescent Gas Company—

a large majority of the stock; that he had a monopoly charter for fifty years; that the old company's charter would expire in 1875; but that they claimed an extension of twenty years." To the inquiry "how he knew that they have not the right of extension," Attrill replied "that he had the opinion of Mr. Wallis, Mr. Reverdy Johnson and others." Patterson then asked "what he proposed to pay," to which Attrill replied $25,000.00. Patterson replied "you don't suppose I would leave my business in the hands of a boy partner, and go to New Orleans and undertake a contingent negotiation for $25,000.00; it is perfectly ridiculous: why I got $50,000.00 for negotiating the sale of the old Gas Company's stock; and then I was at home, and could attend to my other business while I was making the negotiation." He then said, "Oh! this is a matter of no importance, you can fix it up in no time; the whole amount of it is, Duncan F. Kenner is down there now, and really has the matter at a head." To this Patterson replied, "that may or may not be, but large transactions are not fixed up in a few days; there is great uncertainty; nothing may grow out of it; do you suppose I am going to jeopardize my life with yellow fever; I do not propose to go, and take these risks, and with probably no compensation." The conversation was then broken off and no agreement was reached. In the course of the same day or the next day, in obedience to a message from Attrill, Patterson went to see him, and the conversation was renewed. Attrill said, "Patterson, I want you to go down to New Orleans and manage this transaction; the fact of the matter is, I have committed myself to parties interested with me; I have told them you are the only man I would entrust with such a negotiation." Patterson replied, "Attrill, I will not go for twenty-five thousand dollars." Attrill said, "I want you to go, and if there is a good negotiation effected, you shall have what you got here, $50,000.00; when can you go?" Patterson,

answered: "I am ready to go now—I will send up for my trunk." Patterson was then told to come around to tea, and they would go over all the papers together, which were connected with the business; and that letters of introduction would be prepared and be ready for him, and he should start the next day. Patterson further testifies, that in this conversation Attrill said, "that he had employed Mr. Kenner, and that Mr. Kenner had really a large number of the stockholders (of the old company) committed to a compromise with this company; and that was the method by which they proposed to accomplish it." Patterson inquired, "suppose they should not compromise under such circumstances?" Attrill answered, "we will drive them to the wall; we will test the unconstitutionality of their charter, and bring them to terms." Pursuant to the invitation, Patterson went to Attrill's that night, and was shown all the papers and all the publications that had taken place respecting the matter—Mr. Wallis' opinion to the effect that the Act of the Legislature by which the New Orleans Gas Company's charter was attempted to be extended for twenty years, was invalid. Being furnished with all these documents he went to New Orleans on his mission.

In the course of his examination as a witness, Patterson was asked, by his own counsel, "if there was any limitation put upon the means he was to use, and if so, what?" He replied there was no limitation; "I had full and plenary power to do anything and everything I saw proper." But that is manifestly only the construction he chooses to put on the contract; for he expressly says in reply to a question from Attrill's counsel, "if anything was said with reference to any proceedings, other than proceedings for *compromise—legal proceedings*—proceedings to coerce them?" "*There was nothing said on that subject;* because, he (meaning Attrill,) was so hopeful at that time, that he really took it for granted that Mr.

Kenner really had brought things almost to a point of consummation."

Taking the contract upon which Patterson started for New Orleans, to be just what he has represented it to be, in the conversations which he has narrated, it is almost too plain for argument, that *this* contract ·contemplated nothing but negotiations, through which resort to legal proceedings were to be avoided. Negotiations and compromise exclude the idea of actual resort to hostile litigation. To compromise, is to adjust a dispute by mutual concession. To negotiate, means substantially the same thing; to effect something, or an effort to effect something by treaty or agreement. This is what lexicographers say; and it is the common sense, every-day understanding of such language. Men go to law only when they cannot come to a peaceful agreement as to their respective rights and claims as against each other. To negotiate a compromise between these two companies, was what this contract contemplated Patterson was to effect, or aid in effecting; and if his skill in such matters, of which his employer seemed to have such full appreciation, accomplished or aided in accomplishing an advantageous—"a good compromise," he was to have the sum stipulated for as compensation. Delay was a serious matter, if construction had to be undertaken; or if a law suit must precede or accompany it. Hence, expedition was urged; and all through the correspondence, Patterson was entreated to effect the compromise as quickly as possible. That this construction is right, and was the understanding Patterson had of it at the time, is abundantly clear from what Patterson said at the time of making the contract, and what he said in his testimony. He said in the conversation with Attrill, he would not go for twenty-five thousand, taking the risks, when *"nothing might come of it,"* and he get *"no compensation."* Therefore, as "probably he would get no compensation," he insists on double the

amount Attrill offered him, as the contingent compensation to be received. Attrill consented, and for that large sum, in the event of success, he undertook the negotiation. In his testimony, he says expressly, that "compromise was the main object in view; and that Attrill actually thought that Kenner had it nearly accomplished, and only needed Patterson's help to accomplish it in no time." The mode by which such compromise was to be effected, as stated in the conversation, when he was employed by Mr. Attrill, was by some means to get the members of the old company, one by one, in favor of, and committed to a compromise. Kenner, was stated to have many already committed to it, and by Patterson's address and diplomacy, a sufficient number, it was hoped, would be won over to the scheme, to make the effort a success. It is beyond doubt that in this first employment, it was not contemplated or dreamed of that Patterson was to initiate or superintend litigation in the Courts, by which the claims of the Crescent City Company should be *settled*, if that should ultimately become necessary; and that he should reap the benefit of costly litigation, which would have to be conducted by lawyers. It is plain that Patterson was employed to avert the necessity of that resort. It was only in the event of absolute refusal to compromise that Attrill said to Patterson, "then we (meaning himself and *'parties interested* with him,') will push them to the wall, &c." He was especially averse to litigation, knowing as he did the uncertainty of the law, and fearing no doubt that after all, his counsel might be mistaken in their view of the strength of his position in the law; or dreading the immense expense, immediate and prospective, which the construction of new mains and appliances would involve; and perhaps dreading the expense of litigation. From whatever cause it proceeded, that aversion was so great, that when brought face to face with litigation or abandonment of his interests in the new company; when all hope

of compromise was gone; Patterson says, he "wilted," and only by his persistent entreaties, advice—and almost coercion—was he brought to the assertion of his rights in the Courts. With such testimony before us, it is impossible to believe, that the contract of employment, the words of which exclude the idea, could have intended to confer on Patterson such powers as he claims under it. This statement of Patterson is of itself sufficient to demonstrate, that up to that time, Attrill had never authorized the employment of counsel, or the institution of any legal proceedings whatever, with any other view than by feint or menace to promote the attainment of the "main object"—compromise. The compromise which was desired and sought, was without doubt either the purchase of the old company out at a price such as was offered, or the sale of the stock of the Crescent City Company and its franchises, for a satisfactory amount. The new Company as we have seen, did not want to build if it could be avoided; nor did they want to buy except at their own price. The compromise which was most coveted, was the sale of their stock and charter rights. That was finally done at the end of the litigation. Patterson admits that "negotiations failed; and it was the law suit which forced the compromise. Negotiations for a compromise really ended on the 17th of December, 1873, when the letter of Jackson, on behalf of the New Orleans Gas Company, rejected the propositions of the Crescent City Company, and offensively characterized them. It is true, that after that, Patterson, clinging to the hope of compromise not being impossible, endeavored unavailingly to keep the matter open on that line; but, on the tenth of January, 1874, Attrill telegraphed Patterson he would positively "carry it no longer" on compromise measures.

The suit, which was instituted after consultation with attorney Gibson in St. Louis, was not begun until the 14th of February, 1874. From its institution to its suc-

cessful termination, Patterson had been wholly ignored, had been excluded from the counsels of the lawyers and those interested in the matter, and never participated again in any way.    Before its institution, he had been directed to close negotiations and to meet Attrill at St. Louis.    After the St. Louis trip, the consultation with Mr. Gibson, and his employment as a lawyer to take necessary legal steps, Patterson was made to fully understand that his services were no longer needed, and could avail nothing.    In fact, he was discharged.    He says he was "pitched out."    He complained to Attrill of his exclusion from confidence and counsel, and told him "he understood his case better than he did, and better than most of his counsel."    Attrill replied, that "the matter was in the hands of lawyers, and they did not need his advice." Then and thus ended their intercourse.

The suit instituted by Mr. Gibson and his colleagues, as has already been stated, resulted in sustaining the whole theory and claim of the Crescent City Company, and put the old gas company entirely at the mercy of the new one. Under such circumstances the terms were easily arranged for the consolidation, or amalgamation of the companies, which was effected.    This final agreement Patterson calls "a compromise," to the benefit of which, as "a good compromise" he claims to be entitled, by the agreement; being as he contends the result of his advice and entreaty. As has already been said, this claim is based on the theory that he was authorized to proceed by litigation if necessary; and 'that if he was not clothed with such power in the start, his powers were subsequently enlarged; and that after all he had done in the matter he could not be discharged so as to deprive him of his right to the agreed contingent fee.    There is some evidence in the record, in the letters of inquiry, (in November and afterwards,) concerning progress, when the negotiations did not prosper and promise immediate success, of authority to employ counsel and institute some legal proceeding.

One "Wood," a stockholder of the old company, was induced to take action in his name which came to naught. But manifestly, from all the proof, any demonstration then by Attrill or his company, of suit was only to make a show of proceeding by law, in order thereby, if possible, to promote a speedier agreement. It is conclusively shown in the testimony that Attrill never designed resorting to suit in his or his company's name really, until after consultation with Gibson. Nor was he satisfied that such was advisable while hope of compromise remained; for after the 17th of December letter of Jackson rejecting the proposals of compromise, and breaking off the intercourse looking to it; viz., on the 25th of December, 1873, Attrill wrote to Patterson saying he was not sure it was best to bring any suit—that it "might widen the distance between us and prevent a compromise." Here is evidence again, as late as the 25th of December, 1873, that compromise was the thing which was to be obtained, and hesitation on the part of Attrill to do anything which might have an effect contrary to what was hoped from it. It is true, in this letter he afterwards gives Patterson authority to use his discretion about it; but it was still only with the view of helping him to the end and object of his mission—"compromise."

There is also in the record, evidence of communications from Attrill to Patterson after the 17th of December, 1873, and up to February, 1874, tending to prove Attrill was still retaining Patterson in his employment in some capacity; and tending to prove authority to him to consult lawyers, and perhaps employ them for Attrill to commence some kind of suit. Whether this continuation of Patterson in his employ, by Attrill, in the way mentioned, had the effect to so modify the contract originally made, as to entitle him to claim rightfully, that he was taken into the case as agent, and general manager, so that he cannot be refused payment, according to the terms originally speci-

fied as his fee in the event of a good compromise being effected; and so that Attrill could not afterwards discharge him without paying him, as if he had continued in the case, and contributed to the ultimate agreement which was made, is the main question to be decided. We will, therefore, now consider some of the legal principles which must be applied to the case. These have been discussed with pre-eminent skill and learning; and, in view of the peculiar facts and circumstances of the case, we have found no little difficulty in reaching the conclusions we shall announce; but we think they rest on solid foundation both of reason and authority.

It may be laid down, as a general rule, that an agent's authority to act for a principal, is alway revocable at the will of the principal; and may at any time be put an end to by withdrawing the authority; unless the authority be coupled with an interest; or has been conferred on the agent for a valuable compensation moving from him to the principal. 1 *Parsons on Contracts,* 69; *Wharton on Agency,* 95, *and notes; Story on Agency,* secs. 463 *and* 464; *Hunt vs. Rousmanier,* 8 *Wheaton,* 174; *Simpson vs. Lamb,* 84 *E. C. L.,* 603; *Blackstone vs. Buttermore,* 53 *Pa.,* 266; *Hartley's Appeal, Ib.,* 212; *Creager vs. Link,* 7 *Md.,* 259.

What constitutes an authority coupled with an interest, the decisions without exception, are agreed about. In *Hunt vs. Rousmanier,* already cited, Chief Justice MARSHALL says, it "is an interest in the thing itself on which the power is to be exercised, and not an interest in that which is to be produced by the exercise of the power." In *Blackstone vs. Buttermore,* 53 *Pa.,* 266, the same rule is laid down in almost the same terms, and that is now the doctrine of all the text books.

There is a class of cases, where, if the agent has done something in virtue of his authority, and incurred expense before the agency is revoked, he will be entitled to be reimbursed. For example, if the negotiations of a broker

employed to sell property be broken off by the principal, after he has gone to trouble and expense in the matter, he will be entitled to recover for what he has done, on a *quantum meruit.* *Story on Agency,* sec. 329; *Wharton on Agency,* sec. 322. This case having been assimilated to the case of a broker to sell real or personal estate, or negotiate a loan, it is necessary to lay down the general rule applying to such agents. The rule is, that the broker is not entitled to his commissions till the work is *complete;* but, if after the sale is virtually effected, the principal takes the matter into his own hands, and revokes the agency, he cannot escape the payment of commissions. In such cases, and there are many of them in the books, the broker is regarded as having earned his commission or compensation, by being the procuring cause of the transaction being consummated. *Ewell's Evans on Agency,* sec. 453; *Keys vs. Johnson,* 68 *Pa. State Rep.,* 42. In *Keener vs. Harrod & Brooke,* 2 *Md.,* 71, Judge Tuck, speaking for this Court, expounds the principle controlling such cases thus: "We understand the rule to be this, (in the absence of evidence of usage,) that the *mere fact* of the agent having introduced the purchaser to the seller, or disclosed the names by which they came together to treat, will not entitle to compensation; but, if it appears, that such introduction or disclosure was the *foundation* on which the negotiation was begun, conducted, and the sale made, the parties cannot afterward, by agreement between themselves, withdraw the matter from the agent's hands, so as to deprive the agent of his commissions." This case, and all others are in harmony with it, establishes the rule that the agent must be the *procuring cause* of the transaction, whatever it is, being consummated. It is a matter of proof. The fact that the agent brought the parties together, might raise a presumption, if the transaction was consummated in a short time thereafter, that he was the procuring cause; but that could be

rebutted, as was done in *Earp vs. Cummins*, 54 *Pa.*, 396, where the purchaser, (who the Court said, if anybody knew, must know,) testified he "was not influenced at all in making the purchase, by the agent." There, the negotiations, which were first begun, because of some publications by the agent, who sued for commissions, were broken off. Several months afterwards, by the *influence* of *other parties*, the purchaser was induced to renew the treaty, and bought the property. The Court of final resort, said the plaintiff, was improperly allowed to recover commissions, and judgment was reversed.

Applying these principles to the case in hand, we cannot see how Patterson can be regarded as having contributed, in any proper legal sense, to the production of the result finally attained. It can hardly be termed a compromise. It was the dictation of terms to a conquered or captured foe. But Patterson insists that, because he advised the suit, he is entitled to his compensation; for the "compromise," effected at the termination of the suit, "was a good one." The institution of the suit did not bring the compromise. Had the bare institution of suit brought the compromise, Patterson's claim would be better founded. It was, however, nothing less than the *judgment* of the Court of last resort, after tedious and costly litigation that rendered the old company helpless, that brought consolidation. An essential condition, then, in the original contract, was not fulfilled by the agent. He did not procure the compromise.

All the parties best able to speak on the subject, as in *Earp vs. Cummins*, say he did nothing towards bringing it about; and they were not influenced, in the slightest degree, by anything he had done. The original contract, as we have said, did not give Patterson unlimited powers, to settle the matter by any means whatever, including costly litigation, so that he should be entitled to his contingent fee, no matter how the result was brought about.

He was certainly not prevented by any action of Attrill from bringing about a settlement by peaceful measures, so as to entitle him to recover on that score. How long the mission of Patterson was to continue, was of necessity uncertain from its very nature. Nothing was said about that in the contract; nor was any restraint put upon the principal's authority to bring negotiations for a compromise to a close whenever he saw fit. If he did put it to an end when there was a reasonable prospect of success, Patterson might have had just cause of complaint, and perhaps of action for injury on account thereof, if he could make out a case of injury; but by his own confession, his efforts to procure a compromise *had failed*, and *he* urged and advised coercive measures instead. And there is evidence in the case, tending to prove, that at that time, he thought he had failed to make his fee, and was disappointed and chagrined at the loss of what he had so anxiously hoped for. In point of fact, there was no need of formal revocation of his authority to procure a compromise; it had expired in signal failure. He had no interest in the thing beyond his contingent fee, and had paid no valuable consideration for his agency; so that, the case falls within none of the exceptions, which disallow revocation. Unless, therefore, the subsequently conferred authority to consult counsel and initiate proceedings, so enlarged his powers as to connect him with the case in such way, that he was entitled to see it to the close through the Courts, and enjoy his fee, though secured through litigation, the revocation cannot have done him injury for which he can claim his fee. We have already shown that the proof shows, that all the litigation threatened or given notice of, prior to the final and successful suit, was intended only as menace to promote settlement. And it is very certain, that the contract did not contemplate paying the agent for any influence he might exert over his principal. The agent was employed to operate on the enemy; so that

Patterson cannot claim in this suit payment on that account; though, as will be seen hereafter, we think he has some ground of claim against the appellant. Anything which he did, however, in the way of consulting or employing counsel, in and about the suit, (which was finally devised, and advised by Mr. Gibson, and was brought by him and others,) by the direction or permission of Attrill, stands independent of, and outside, the original agreement; and cannot be interjected into it, and made part of it. A special agreement, like that set out by Patterson in his testimony, cannot be so far enlarged by implication, as here sought in this way, as to change the whole character of service to be performed, and yet bind *both parties* to the specific sum agreed to be paid for the service originally contracted for.

It is the usual rule in agencies, that where a principal has an agent employed at an *agreed compensation,* and the principal confers on him additional powers which involve greater duties, with *no stipulation* for additional compensation, he cannot recover extra wages for the additional service, unless a custom has fixed it otherwise. *Wharton on Agency, sec.* 323, *and notes; U. S. vs. McDaniel,* 7 *Peters,* 1; *Moreau vs. Dumagene,* 20 *La. An.,* 230. If that be so, *a fortiori* the requirement of additional duties, and their performance by the agent cannot be taken by implication to remove the original agreement into provision for that very service, and to make the compensation agreed on, a compensation for services in future of the new character. Some of the services set up as enlarging the effect of this agreement could very well comport with the idea of *their* promoting the compromise which was sought. Of course, we now refer to what was directed and done in respect to counsel and suits anterior to the rupture in December, 1873, by the rejection of overtures for compromise; and the cessation, by Attrill, of all efforts to procure one. There is an

aspect, however, of this case entitling the plaintiff to some recovery, notwithstanding there may be no maintainable claim on account of the claimed revocation of the agency. If after the failure of efforts to compromise, Patterson was detained away from his home and business, in New Orleans or St. Louis, by any device of Attrill, or for any purpose or business of his, and did anything for Attrill in the execution of a special authority, he is entitled to recover therefor. In that respect it is a case essentially different from the cases already alluded to in 7 *Peters* and 20 *La. Annual*. For here, that, which may be spoken of, or regarded as extra service, was done after the agency proper had terminated—that is to say, after efforts to compromise proved abortive. That which was done anterior to the 17th of December, 1873, in the way of consultation of counsel and the feint of suits, was germane to the object then sought and with a view to promote it, and would be excluded by those cases or the principle of them. Assuming that what Patterson did after the failure to secure a compromise, was done under the impression he was being retained in the case as Attrill's agent for the supervision of the case and the general management of the matter; and was mistaken in Attrill's wishes until actually discharged; still, as we have seen, the old contract would not cover the new situation. There was such a deviation from the original plan and agreement, that it had no application to the new condition of things. In building contracts where there is a deviation from the original plan, the rule is, that if the plan is wholly changed, or so much so that the work cannot be traced by the contract; in such case the work must be paid for according to value and not by the contract. 2 *Addison on Contracts, secs.* 555 *and* 870. In this case there was such an entire abandonment of the plan of operations contemplated, at the time Patterson was, employed, and the agreement was made, that the original bore no resemblance to the new; and

whatever relation the appellee bore to the new plan of
operations, in the absence of any special contract with
reference to it, there was no barrier to his discharge at
any moment upon his being fully re-imbursed, and paid
for his time and services in respect to the new departure.
His expenses it must be remembered were all paid.

In *Simpson vs. Lamb,* 84 *E. C. L.,* 603, (already cited,)
the plaintiff had been employed as agent to sell an advow-
son, upon a compensation of five per cent. of the purchase
money. Before he had procured a purchaser, the em-
ployer sold it himself. The Court held that he had no
claim against the defendant; but that if he had shown
expenses incurred, he could have recovered on a *quantum
meruit;* provided the steps were taken, and expenses in-
curred before knowledge of sale by his employer. The
Court asserted most unequivocally the right to revoke.

In *Campanari vs. Woodburn,* (15 *C. B.,*) the plaintiff
was employed to sell a picture, for which he was to re-
ceive, if he succeeded, one hundred pounds. Before he
had sold, the principal died. He afterward sold the pic-
ture, and the administratrix ratified the sale; but refused to
pay the hundred pounds. It was ruled that the principal
in his life-time could have revoked without liability for
more than expense or labor actually incurred before revo-
cation; that death operated to revoke, and unless the
administratrix had been shown to know of the contract
before ratifying the sale, she was not bound for the hun-
dred pounds; but might have been liable for a reasonable
remuneration; but that was not declared for.

The same doctrine is maintained in *Pritchet vs. Badger,*
87 *E. C. L.,* 295, where it was ruled that in case of revo-
cation a party could recover for services actually rendered
on a *quantum meruit.* The case of *Toppin vs. Healey,* 11
*Weekly Reporter,* 466, is to the same effect. We refer
also to *Tombs vs. Alexander,* 101 *Mass.,* 256, and *Walker
vs. Tyrrel, Ib.,* 257. Although this is a case where the

amount of damages to be recovered should be left to the jury on the evidence of the service and time given to the defendant; yet we do not think it is a case falling within the class of agencies to sell land, and the cases of that character where the agency is revoked after the party had done something in the premises,—such as bringing the parties into treaty, by introducing them to each other at some pains and cost. Here the plaintiff was employed to aid in a negotiation where the parties were already acquainted and in treaty,—other agents being engaged in the work of negotiation,—and failing to accomplish what he engaged to do, and was to be paid for doing, gives his time to his employer while he sets on foot proceedings to accomplish at law, what he could not settle by compromise.

The situation of this case may be thus illustrated by a supposed case of agency to sell land, wherein, we think, it will hardly be contended that the agent would be entitled to compensation. A and N have conflicting claims to a tract of land. N is in possession claiming absolute title. A claims that by the true construction of the will of X the title of N and his right of possession will expire in five years time. N claims that the provision in the will of X, on which A bases his claim is void. N has put on the land large improvements for manufacturing, with all the necessary machinery. A has counsel that his claim is sound and maintainable at law. A desires to continue the same kind of manufacturing operations upon the land when he gets possession, and is in treaty with N, for a settlement of the controversy by compromise; each conceding something. K is acting as agent for A, in the negotiations, and thinks he has a good prospect of success. A believing P to be especially adroit in such things employs him, to co-operate with K in securing a compromise with N, and

promises P a large contingent fee in the event of success-
ful negotiation.

Suit is threatened by A, and perhaps. actually insti-
tuted, through the agency of P, to menace N into com-
promise. N refuses any and all approaches, adhering to
the view that his position is impregnable. Compromise is
impossible. P's address wholly fails, and he confesses it,
but he urges upon A to fight it out at law, which he
reluctantly concludes to do;—employs counsel, (perchance
at P's suggestion,) and takes P to give the counsel "the
points." Suit is instituted at large expense and cost, and
after "enduring the law's delay," A gets finally from the
Court of last resort a decision in his favor. N has only a
brief space left for enjoying possession. A's success is
complete, and N submits to A's terms for possession
and machinery. P then claims his contingent fee. Can
it be possible that by any rule of law P's claim can be
sustained? Clearly not. The most he could possibly
claim for, would be for any loss of time or service he had
rendered A at. his solicitation, after compromise mea-
sures failed. If not, then the plaintiff's claim for his fee in
this case, as pressed, cannot be sustained. It is as totally
without foundation, as the claim of P in the supposed
case.

Bringing the instructions granted and rejected to the
test of these views and principles, we find there was error
in granting the first and second prayers of the plaintiff.
Those instructions considered separately, or as together
constituting one instruction, should not have been granted.
.They proceed upon the theory, that Patterson's agency
was irrevocable, except upon payment of the whole con-
tingent fee; that the facts narrated in the first prayer
amounted to authority to Patterson to do anything and
everything, including the prosecution of the suit to *a con-
clusion,* for the purpose of accomplishing the object; that
his action was not confined to compromise measures only;

or if he was at the outset, that the facts stated amounted to such an enlargement of his powers, as made him the agent of Attrill for all purposes connected with the transaction; so as to entitle him to full compensation according to the original agreement, notwithstanding his discharge, upon the successful ending ·of the suit, and amalgamation of the companies. It is unnecessary to analyze the prayers. We have discussed the case, and repetition would needlessly elongate this opinion, already unavoidably long.

It is proper to say of the first prayer, that considered alone, it enumerates facts which according to the view we have, and have expressed, should not have been included in it, because it makes it misleading. We forbear to particularize, as we think we have sufficiently indicated in our discussion of the case, our views.

Such being our view of the plaintiff's first and second prayers, it was error to qualify the defendant's first and fourth prayers by making them in any way dependent on them. We will only say with respect to the first and fourth prayers of the defendant, that the proposition intended to be submitted by them was correct. The prayers themselves may need modification in consequence of the views we have expressed and on which the case must be tried upon remand. The third prayer of the defendant should have been granted, and it was error to reject it. We see no valid objection to it.

The fifth, and the fifth and a half prayers of the defendant, were properly rejected. They denied the right of the plaintiff to recover anything, and excluded from the jury the evidence of service, and of detention away from his home and ordinary work, at the instance of the defendant, ·of the plaintiff; to which we have already adverted as a ground of recovery under his declaration.

The proposition of law submitted by the sixth prayer is sound so far as it intends to ask the Court to say that the advice and persuasion of Patterson form of themselves no

ground of recovery. We have already sufficiently expressed our views on that subject.

Upon a remand, unless there is evidence other than we have before us, there will be no ground for the seventh prayer to rest on, and we need not consider it further.

The eighth prayer we need not consider.

The proposition of law intended to be submitted by the defendant's ninth prayer is sound, and with modification to suit the case as presented on the new trial should be granted.

The tenth and eleventh prayers are correct and should have been granted.

The measure of damages is just what the jury may find the services, if any, of the plaintiff, rendered the defendant, and his time if any, occupied for the defendant at his instance, after the failure of compromise negotiations, to have been worth, and ought reasonably to be paid for them; and the measure of damages is not what was fixed by the agreement in September, 1873, as the contingent compensation dependent upon effecting a compromise; but the twelfth prayer does not properly present the question as we look at the case.

It is proper to say in this connection, that the cases of *Jaffray vs. King,* 34 *Md.; Dugan vs. Anderson,* 36 *Md.,* and *Slack's Case,* 45 *Md.,* have no application to this case.

As they were relied on by appellee's counsel, we thought it but proper to say, that we intend nothing we have said to be in conflict with the principles established in these cases for contracts for service, for specified time and specified compensation.

The appeal of Patterson will fall with the reversal of the judgment, and order for a new trial. But we think it proper to say that the action of the Court, in requiring the plaintiff to remit so much of the verdict as was in excess of the damages laid in the declaration, was in entire conformity with the law, practice and decisions of the State.

Pennsylvania R. R. Co. *vs.* Reichert.

*Code, Art.* 29, *sec.* 39; *Harris vs. Jaffray,* 3 *H. & J.,* 543; *Poe's Pleading and Practice,* 422.

This record embodies so much that ought to have been omitted under the rules of this Court; that we shall reverse with the requirement that the costs of the appeal shall be divided between the parties equally.

*Judgment reversed and new trial*
*ordered, the costs of the appeal to be*
*equally divided between the parties.*

(Decided 22nd March, 1882.)

ROBINSON, J., dissented.