## CHARLES T. LEVINESS *vs.* JOHN J. KAPLAN.

*Right of Insurance Agent to Commissions—Abandonment of Employ-
ment—New Application Filed by Another Agent—Increased Insur-
ance—Usage.*

When a life insurance agent after procuring the application of a party for
insurance, which is not accepted by the company, abandons his em-
ployment as agent, and a year afterwards another agent obtains from the
same party a new application of insurance which is accepted, the first
agent is not entitled to commissions on such policy.

Plaintiff as sub-agent of a life insurance company filed, in November,
1900, the application of a party for insurance amounting to $10,000.
The medical director of the company postponed the application for six
months and the effect of such postponement was to make an entirely
new application necessary. In the following July, plaintiff left the em-
ployment of the defendant, who was the general agent of the company,
and remained away until January, 1902, when he resumed work for de-
fendant for a few months. In November, 1901, another sub-agent filed
a new application of the same party for insurance amounting to $20,000,
which was accepted. Plaintiff brought this action to recover commis-
sions on the policy so insured. *Held*, that it was error to instruct the
jury that the plaintiff is entitled to recover if they found that plaintiff's
work was the procuring cause leading to the application for the $20,000
policy, because there was evidence to show that plaintiff had aban-
doned his work as defendant's sub-agent, and in that event he would
not be entitled to commissions merely on the ground that he had filed
the first application of the insured which was then rejected.

*Held*, further, that the plaintiff would not be entitled to recover if there
was a usage among insurance companies by which commissions are
payable to the agent who gets a new application for the insured which
is accepted after a previous application filed by another agent has been
rejected, and that the question of the existence of such usage of which
evidence was offered, should be left to the finding of the jury.

When the agent of a life insurance company obtains a party's application
for insurance which is postponed and a year afterwards another agent
procures from the same party a new application from the same party
for double the amount of insurance which the company accepts, the first
agent, if entitled to any commissions, is limited by the amount of the
original application.

Appeal from the Superior Court of Baltimore City (Dob-
ler, J.)

*Plaintiff's 1st Prayer.*—If the Court, sitting as a jury, find from the evidence that the plaintiff was a solicitor or sub-agent of the Bankers' Life Insurance Company of New York, and that his work was the procuring cause leading to the application for a policy of $20,000 by one J. W. Middendorff, then its verdict must be for the plaintiff for the amount of commissions provided in his contract as sub-agent or solicitor, namely, 50 per cent of commissions for premiums on policies up to $10,000 and 30 per cent of commissions for premiums on policies in excess of that sum. (*Granted.*)

*Defendant's 1st Prayer*, denied the legal sufficiency of plaintiff's evidence.

*Defendant's 4th Prayer.*—That if the Court does find for the plaintiff that its verdict cannot be for the amount in excess of the commissions claimed upon the first $10,000 as to that item of the plaintiff's suit, and not upon the second $10,000 if the Court should believe that the plaintiff procured an application for $10,000 and that the defendant through another agent procured the second $10,000. (*Rejected.*)

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE and SCHMUCKER, JJ.

*Charles W. Heuisler* and *E. Allan Sauerwein, Jr.*, for the appellant.

*J. N. Ulman* (with whom was *Harman, Knapp & Paper* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Superior Court of Baltimore City rendered in favor of the appellee against the appellant. The latter was a general agent in several States for the Bankers' Life Insurance Company, and the former was employed by him as a solicitor or sub-agent. The suit is for commissions on a policy of insurance issued by that company on the life of William Middendorff, and for another item

claimed to be due the appellee by the appellant.    In November, 1900, Mr. Middendorff authorized the appellee to apply for insurance for him to a large amount and among others he filed an application in the Bankers' Life Insurance Company for insurance amounting to the sum of ten thousand dollars. The medical director of that company "postponed" the application for six months.    The record states that "It is agreed that when an application has been postponed for a definite period nothing can be done either by the insured or by the company or agent during the period of postponement, but that after the period of postponement has elapsed a new application is necessary, and that application, while it can come at the suggestion of the insurance company, is usually brought about by the agent or sub-agent who has charge of the matter."

Mr. Middendorff went to Europe for his health in the spring or early summer of 1901 and remained there until the fall of the year.    The appellee left Baltimore in July, 1901, and remained away until January, 1902;    He testified that he was not certain whether Mr. Middendorff left for Europe before he (Kaplan) left Baltimore, but after the period of postponement had elapsed (May, 1901), he says he saw Mr. Middendorff frequently and had him examined by the physician who recommended the trip to Europe.    In November, 1901, Charles T. Leviness, Jr., son of the appellant, who was also an agent of the Bankers' Life Insurance Company, employed by his father, had some business with Mr. Rutherford, a partner of Mr. Middendorff, and a policy holder in the Bankers' Company, when Mr. Middendorff came in the office.    Young Leviness said, in answer to the question, "By whom was the matter broached, you or Mr. Middendorff?"    "Mr. Middendorff; it was brought about in this way ; Mr. Rutherford mentioned that Mr. Leviness was telling him something about the policy, and Mr. Middendorff said, Yes, I remember having some dealing with the company, but they refused to accept me at the time ; and he said he would be glad to go ahead with it if it were practicable and possible at that time, and I questioned

him about his health and decided to progress with the matter."
It resulted in a new application for twenty thousand dollars,
which after several examinations of the applicant the company
accepted.　The difference in amount was explained by the fact
that when the first application was made the Bankers' Insur-
ance Company limited its policies to ten thousand dollars,
upon the life of any one person, and before the second the
limit had been increased to twenty thousand dollars.　The
policy was issued and Charles T. Leviness, Jr., was paid the
commissions allowed sub-agents by the appellant—he having
filed the application.

The case was tried before the Court without a jury.　Two
prayers were offered by the plaintiff (the appellee), which were
granted, and four were offered by the defendant (the appel-
lant), which were rejected.　The verdict being for the plain-
tiff this appeal was taken from the rulings of the Court on the
prayers.

"The powers and rights of an insurance agent as regards
his principal are, in the main, governed by the rules of law
applicable to agents in general," 16 *Am. & Eng. Ency. of Law*,
911.　There is a distinction between insurance brokers and
insurance agents representing companies.　The former are
middle-men between the insured and the insurer and usually
place the insurance with companies selected by the insured, or
with those of their own selection, if the assured make no se-
lection, while the latter owe duty and allegiance to the com-
panies employing them.　The appellee was a licensed insur-
ance broker, but it is admitted that he was also a sub-agent of
the Banker's Insurance Company, employed by its general
agent, the appellant.　There have been a number of cases de-
cided by this Court relating to the right of brokers and agents
to recover commissions.　As a rule the agents in those cases
were employed to sell property or obtain loans, but the gen-
eral principles announced in them are for the most part appli-
cable to the one now before us.　It was said in the early case
of *Kenner* v. *Harrod*, 2 Md. 63, "We understand the rule to
be this (in the absence of proof of usage) that the mere fact

of the agent having introduced the purchaser to the seller, or disclosed names by which they came together to treat, will not entitle him to compensation; but if it appears that such introduction or disclosure was the foundation on which the negotiation was begun and conducted, and the sale made, the parties cannot afterwards, by agreement between themselves, withdraw the matter from the agent's hands so as to deprive him of his commissions." The Court also stated that "The legal import of an agreement to procure a purchaser binds the party to name a person who ultimately buys the property." Among other cases are *Beale* v. *Creswell*, 3 Md. 196; *Kimberly* v. *Henderson*, 29 Md. 512; *Attrill* v. *Patterson*, 58 Md. 226; *Blake* v. *Stump*, 73 Md. 160, and *Leupold* v. *Weeks et al.*, 96 Md. 280.

The appellee relied mainly on the one last mentioned. Without stating the facts in detail, it is sufficient to say that this Court, being called on to consider the evidence (it being a proceeding in equity) found that the contract of sale as ultimately consummated, was the result of Leupold's work and influence, and that the modifications of the contract by the receivers of the Baltimore Company were made at such times and under such circumstances as not to affect Leupold's right to commissions. It was there said, in speaking of the modified contract, that "the cardinal transaction, *i. e.*, the purchase of the German patents on the automatic telephone exchange for the use of the Reichspostamt is the same in both contracts, although the latter contains the modifications in the details of the former one," and we held that "In this state of facts Leupold, who as agent procured the purchaser and introduced him to the seller and arranged the terms of the contract that formed the foundation on which the sale was ultimately made, must be regarded as the procuring cause of that sale, notwithstanding the fact that its terms were modified by the principals themselves or those claiming under them before its consummation." No new principle was announced in that case, but we only applied to the facts, as we found them, the law as previously determined by this Court in many cases.

The term "procuring cause" is one frequently used in this class of cases, but it will not always be safe to simply instruct the jury that if they believe a plaintiff "was the procuring cause leading" to the sale or, as in this case, "to the application for a policy," then the plaintiff is entitled to recover—without bringing to their attention such facts, if there be any, as might relieve the defendant or restrict his liability. The plaintiff's first prayer declared as law that if the Court sitting as a jury found that the plaintiff was a solicitor or sub-agent of the Insurance Company, "that his work was the procuring cause leading to the application for policy of $20,000 by one J. W. Middendorf," then its verdict must be for the plaintiff for the amount of commissions provided in his contract as sub-agent or solicitor, namely," etc. This prayer which we may take as a test of the legal principles intended to be announced by the Court as applicable to this case seems to us to be lacking, under the evidence, in several respects.

In the first place there is evidence tending to show that the appellee had *abandoned* his work as sub-agent of this company under the appellant, its general agent. He left Baltimore in July and did not return until January. He wrote from New York State on September 8th, 1901, to the appellant that a man there would probably write to him to inquire about the appellee. In it he said "He is about to introduce a health food on the market and has offered to have me take charge of the handling of the foods on a percentage. Naturally he wants to know something about my ability to organize. I think there may be some money in it, and possibly will pull me out of the insurance business, which I never liked. I shall probably stay here until November." On December 16th, 1901, he wrote, on paper headed "Washburne & Co., Exporters and Importers, New York & Havana," to Charles T. Leviness, Jr.: "I started a business under the above name. I spent so far $1600 in advertising and literature. I need $500 to pull me through. Will you let me have it, if I give myself as security? What I mean is, that I will let this thing run in the hands of an employee, and join you in Baltimore

and stay with you until May.   It may not be a bad outlay for father or yourself either to have my services for 4 months.  I will undertake to write $200,000   *   *   *   *   I think we could do a good business, you and I during the winter.   I, because I would have to, you because you would want to.  If I do not have the money I ask, the sum already invested will be a total loss."   Young Leviness replied on December 17th, regretting that he could not comply with the request and added "Yes, it would give me quite an incentive to work with you for 4 months, and I would be uneasy throughout the entire time, owing to your beginning, as it were, *and starting fresh,*" and on November 16th, 1901, he had written to the appellee a long letter in which he said, "I have been in hopes of having you work in Baltimore with me this fall again, as I know we could have been a great help to each other.   I have many cases that it is impossible for me to close and good ones at that.   I know if you were here, you could fix them up. Why don't you come down for a month, or rather until Xmas and work with me ?   I think we could each make $1,000."   The bookkeeper of the appellant, who kept the accounts with the agents, said that Mr. Kaplin was not in the employ of the appellant in October, November and December, 1901, and that he did not come back until January.   He was in fact absent from Baltimore, and from the whole territory for which he was employed from July, 1901, to January, 1902, when he returned and worked for the appellant for some months.   He did not explain his absence, did not have the consent of the appellant to remain away and did not intimate to the latter that he would demand or expect commissions on policies issued in his absence under such circumstances as that to Mr. Middendorf was issued.   Is an insurance agent to be permitted to file an application for insurance in November, which is "postponed" for six months, then leave the territory for which he was employed to work in July following, and remain away for six months and then demand commissions on a policy issued on a second application, filed in the following November by another sub-agent in that territory?   If he had

the right to commissions on a policy issued to such person, on a new application filed by another agent, a year after the original one was filed by him, when is his right to commissions to end? It is a matter of common knowledge that there is great competition in the life insurance business, and as the period of postponement of the original application expired in May, he ought, if he were going to demand commissions on a policy issued on another application at least to have made some arrangement to keep in touch with Mr. Middendorf and ascertain if he would make another application, or to have some one to represent him, if the general agent and the company were willing for such a course. It is the duty of the general agent to serve his company faithfully and with reasonable diligence, and it would be a great hinderance to the insurance business if a sub-agent could thus act. So even if his work to get the original application was, in a sense, the procuring cause which induced Mr. Middendorf to apply again, but by reason of his absence for months from the territory where he was employed to work nothing more was done by him, and another agent obtained a new application, he would not be entitled to the commissions, simply because he had gotten the first application, if he had abandoned his work in the territory for which he was employed. There ought, therefore, to have been some qualification to this prayer, to submit the question of abandonment *vel non* to the Court, sitting as a jury.

But, again, the evidence of the appellant is that it is the custom of the insurance companies to give the commissions to the agent who gets the new application, that is accepted. That ought to have been submitted to the Court, sitting as a jury. In *Kenner* v. *Harrod, supra*, followed in *Beale* v. *Creswell, Attrill* v. *Patterson*, and other cases, the rule announced above as to the agent's commissions is expressly qualified by the term "*in the absence of proof of usage.*" If it be the general custom of insurance companies, including the 'Bankers,' to allow the second agent the commission, under such circumstances as we have in this case, in the absence of some special agreement to the contrary, we know of no reason why the

appellee should be entitled to these commissions.    Hence it was an important qualification that should have been made to this prayer, as the evidence tended to establish such custom or usage.

There is still another objection to the prayer.    Even if the two questions above referred to be decided in favor of the appellee, he should not be allowed to recover commissions on more than the ten thousand dollars for which the original application was filed.    The evidence shows that the application for twenty thousand dollars was made at the suggestion of young Leviness.    The testimony of the appellee is to the effect that he expressly limited the one he got to ten thousand dollars.    He said "it was policy" to do it, although the fact seems to be that there was then that limit by the company. But if there be no limit, then according to the appellee's contention if the policy had been issued for ten thousand dollars, and young Leviness, or some other agent had afterwards induced Mr. Middendorf to take another policy, the appellee was then entitled to commissions on the ground that his work was "the procuring cause leading to" the second application. We have been referred to very few authorities on the subject, but in 16 *Am. & Eng. Ency. of Law,* 911, it is said "Where an agent of an insurance company employed on a commission basis procures an application for insurance, and subsequently another agent of the company induces the applicant to increase the amount of the application, the former agent is not entitled to his commission on the additional insurance thus secured," citing *Brackett* v. *Met. Ins. Co.,* 18 Misc. (N. Y.) 239.    The principle thus stated seems to us to be just and eminently proper, and in this case where the first application entirely failed and a year after the first was filed a new application for double the amount was made and accepted, through another agent there is still more reason for the application of the principle.    If the appellee be entitled to recover at all, his recovery should therefore be limited to commissions on the amount of the original application.

The second prayer of the plaintiff refers to the evidence re-

lied on by him in more detail, but it is subject to the objections we have already pointed out as to the first. Neither of them should have been granted as offered, for the reasons we have given.

The defendant's *first* prayer was properly rejected. Nor do we think the *second* proper. It asks the Court to say that if it found that the work of the plaintiff was the procuring cause leading to the application for twenty thousand dollars, nevertheless he was not entitled to recover if the Court further found "that the plaintiff was negligent of his duties, and such insurance was actually placed by another agent because of the negligence" of the plaintiff. The evidence can scarcely be said to mean that it was placed by young Leviness, because of the *negligence* of the plaintiff. The question on that branch of the case is whether the plaintiff *abandoned* his work, including the Middendorf application, for such length of time, in such way and under such circumstances as to justify some other agent taking up that particular matter and not simply whether he had been negligent. The *third* prayer is also too broad. It does not leave to the Court as a jury to find when the plaintiff went out of the service of the defendant, if he was out of it, and it ignores the question whether, as the plaintiff claims, although the defendant denies it, the defendant agreed to "protect" this and other insurance he had undertaken. The defendant's *fourth* prayer should have been granted.

We do not understand how the question referred to at the argument concerning the costs in Cathcart's case can be passed on by us. None of the prayers referred to it unless it be said that the *first* of the defendant does—that there is no evidence in the case legally sufficient to entitle the plaintiff to recover. But manifestly that was the question of fact for the Court, sitting as a jury, to pass on, notwithstanding the amount of the item is below the jurisdiction of the Court. *Williams* v. *Fredlock Company*, 94 Md. 108.

It follows from what we have said that the judgment must be reversed and a new trial awarded.

*Judgment reversed, and new trial awarded,
the appellee to pay the costs.*

(Decided November 18th, 1904.)