**TAHIR ERK v. GLENN L. MARTIN CO.**

**No. 5167.**

Circuit Court of Appeals, Fourth Circuit.

June 12, 1944.

Granville Whittlesey, Jr., of New York City (Donovan, Leisure, Newton & Lombard, Turnbull & Bergh, and Louis O. Bergh, all of New York City, and Simon E. Sobeloff and Helen Sherry, both of Baltimore, Md., on the brief), for appellant.

Charles C. G. Evans and G. Van Velsor Wolf, both of Baltimore, Md. (Marbury Gosnell & Williams, of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Tahir Erk (hereinafter called Erk) brought a civil action against Glenn L. Martin Company (hereinafter called Martin) in the United States District Court for the District of Maryland, based upon an alleged breach of a contract of agency entered into between Erk and Martin. Judge Coleman entered an order dismissing Erk's action for failure to state an enforceable claim against Martin and, in turn, denying Erk's motion for leave to file an amended complaint, D.C., 32 F.Supp. 722. Upon appeal to this Court, 4 Cir., 116 F.2d 865, 871, we directed that leave be granted to Erk to file an amended complaint containing the following allegations:

"That the defendant, in sending said purported cancellation, did so with the intention to delay and hold off in closing the said sales contract or business subsequently entered and closed with the Republic of Turkey until after the said six and eight months period had run, for the purpose of fraudulently, wrongfully and in bad faith endeavoring to deprive the plaintiff of his just rewards and commissions under the said agency contract, and pursuant to said intention, did in fact so delay and hold off in closing the said sales contract or business with the Republic of Turkey."

Judge Coleman also permitted an amendment to the complaint and this amendment was broader than the amendment which was specifically allowed by us. We are of the opinion, however, that the evidence, as it was adduced in the trial before Judge Chesnut, was not sufficient to establish a claim or cause of action in the plaintiff, even under the allegations of this amendment which was allowed by Judge Coleman.

Upon the second trial before Judge Chesnut, Martin moved for a directed verdict in its favor and this motion was duly granted. Judge Chesnut reviewed the testimony at some length and carefully explained to the jury his reasons for directing a verdict in favor of the defendant, Martin. Erk has again duly appealed.

We do not think it is necessary to review in detail all the facts and testimony in this case. We are content to discuss only two questions and, in the light of our decision on these two questions, to affirm the judgment of the District Court.

We proceed, then, to discuss these two questions: (1) The liability of Martin for the cancellation of the agency contract in alleged bad faith; (2) Whether Erk was the procuring or efficient cause in securing the contract executed by Martin and the Turkish Government.

Below are set out, ipsissimis verbis, certain pertinent parts of the agency contract:

"1. This company has decided to appoint you its exclusive representative in Turkey * * *.

"2. Your appointment as our agent in Turkey is to run for an indeterminate period of time, and is cancellable by either party upon a sixty day notice in writing.

"3. In the event this company should elect to cancel this agreement with you, commissions will be payable to you upon any business which you have instigated prior to date of said cancellation, providing said business is closed by us within six months after date of cancellation of agency agreement. * * *

"4. This company reserves the right, at any time, to carry on negotiations direct with your Government, if in our opinion our mutual interests can be better served by our so doing. * * *

"6. The commissions which this company pays on business secured by its agent is 5%. These commissions are due and payable upon the completion of each contract, after delivery has been effected, and payment thereon received by us."

Judge Chesnut told the jury that Erk could not prevail unless the jury could, from the preponderance of evidence, find:

"First, the Turkish Government was ready, willing and able to close a contract for the purchase of military airplanes from the Martin Company on or about June 14, 1935, or at any time within eight months thereafter, despite the fact it could not obtain deliveries of the only model it was willing to buy before July 1, 1936; and also, second, that the Martin Company canceled the agency on June 14, 1935, in bad faith, for the purpose of depriving the agent of his commissions on a sale which was then substantially agreed upon; and also that the Martin Company in pursuance of said purpose to deprive the agent of his commissions declined, neglected or delayed the closing of said contract until more than eight months after the cancellation."

When Erk's counsel frankly conceded there was no proof of the last of these necessary elements—the deliberate delay in closing the contract until the lapse of eight months—Judge Chesnut directed, and the jury found, a verdict for the defendant, Martin.

■ Erk's counsel urgently insist that Judge Chesnut's instructions erroneously restricted Erk's right of recovery. Their contention is that the jury should have been told that, quite apart from any deliberate delay beyond the period of eight months after the cancellation of the agency contract, in closing the contract with Turkey by Martin, Erk could recover if the jury should and could find from the preponderance of the testimony that Martin canceled the contract of agency in bad faith for the purpose of defeating the payment of Erk's commission. Even if this contention be the law (which it is not necessary for us to decide), we think the desired instruction would have been improper in the instant case, for the reason that there was no substantial evidence tending to show that Martin, at the time of the cancellation of the agency contract, had any fair certainty, or even any reasonable hope, of concluding a contract with Turkey for the sale of any airplanes during the ensuing eight months or within any definitely determinable period of time thereafter.

Turkey had manifested in no uncertain terms its complete lack of interest in Martin's B10 planes. Turkey was interested only in the Martin B10B plane, and further insisted that no contract would be concluded by Turkey unless these planes could be delivered by a specified date. All attempts by Martin, and the Turkish Ambassador, to secure from the United States a release of the B10B plane for sale by Martin to foreign governments had met with a flat failure.

The agency contract was canceled by Martin on June 14, 1935. Permission to sell the B10B plane to foreign governments was not obtained by Martin from the authorities of the United States until August 12, 1935, and, then, this permission was expressly conditioned upon the fact that no deliveries of this plane could be made prior to July 1, 1936. After the date of this permission, Martin continuously solicited Turkey for a contract for the sale of these planes but little, if any, interest was manifested by Turkey until September, 1936. Finally, a contract for the sale of 20 planes of the B10B type was executed on January 11, 1937, between Martin and Turkey. Erk claimed a commission of 5% on the sale consummated under this contract.

■ If it be contended that the contract of agency made between Erk and Martin was, by virtue of the right of cancellation given to Martin by the express terms of this contract, quite hard upon, or even somewhat unconscionable as to, Erk, the answer is, as Judge Chesnut said below:

"The contract as made by the parties must be enforced by the courts, and the courts have no power to change or modify the contract or to make a new contract for the parties."

Or, as was said in Cowan, Inc., v. Meyer, 125 Md. 450, 460, 466, 94 A. 18, 22:

"The rights of the parties to a contract must be determined by the terms of the agreement they have voluntarily made. Courts cannot make a different contract for them, or relieve them of the consequences of a bad bargain."

See, also, the previous opinion of our Court, 116 F.2d 865; Holmes Realty Co. v. Silcox, 194 Mich. 59, 63, 160 N.W. 465; American Law Institute's Restatement of Agency, § 446, in which, in Comments (a) and (e), it was stated:

" * * * hence no commission is payable to a broker for producing a prospective customer within a specified time if the latter does not come to an agreement with the principal until after the specified time, except where the principal has agreed with the broker to extend the time or in bad

*faith prolongs negotiations. The broker may protect himself by requiring an agreement that he is to receive his compensation if he produces a customer who enters into negotiations with the principal within the specified time and subsequently completes the transaction.*" (Italics ours.)

"* * * a broker who has not been given the principal's complete terms and whose compensation is dependent upon finding a customer who reaches an agreement with the principal within a specified time may be entitled to receive his commissions although an agreement is not reached within the time limit. He is entitled to commissions if the principal, for the purpose of depriving him of them, *avoids* reaching an agreement with a customer whom the agent introduces within the specified time limit, and thereafter the transaction is completed. Thus, where a broker is entitled to commission if his customer makes a satisfactory offer, but the principal, to avoid payment of commission, *withholds acceptance until after the specified time* or, for the same purpose, protracts negotiations by proposing obviously unacceptable terms, the broker is entitled to his commission." (Italics supplied.)

In many instances, too, such provisions in contracts between a principal and an agent may well accomplish a useful and eminently proper purpose. These provisions serve to protect the principal against stale claims made by agents for commissions on contracts entered into by the principal long after the termination of the agency contract.

We think there is another, perhaps an even stronger, reason, quite apart from the cancellation of the agency contract, which would justify a directed verdict for Martin. The law is well settled that the agent, under contracts similar to the contract here involved, is entitled to his commission if, but only if, the agent is the procuring cause, the efficient cause, or the proximate cause (these terms appear to be used interchangeably) in securing the contract between the principal and the third party.

Thus, in Attrill v. Patterson, 58 Md. 226, 251, it was said:

"This case, and all others are in harmony with it, establishes the rule that the agent must be the *procuring cause* of the transaction, whatever it is, being consummated. It is a matter of proof. The fact that the agent brought the parties together, might raise a presumption, if the transaction was consummated a short time thereafter, that he was the procuring cause; but that could be rebutted, as was done in Earp v. Cummins, 54 Pa. [394], 396, [93 Am.Dec. 718]; where the purchaser, (who the Court said, if anybody knew, must know) testified that he 'was not influenced at all in making the purchase, by the agent.' There, the negotiations, which were first begun, because of some publications by the agent, who sued for commissions, were broken off. Several months afterwards, by the *influence* of *other parties,* the purchaser was induced to renew the treaty, and bought the property. The Court of final resort, said the plaintiff, was improperly allowed to recover commissions, and judgment was reversed."

And, again, in Way v. Turner, 127 Md. 327, 328, 96 A. 676, the Court stated:

"The rule of law applicable to this description of cases has been frequently announced in nearly every state in this country, with some slight variations of phraseology. It is concisely summed up in 4 R.C.L. p. 298, § 43, as follows: 'It is not enough that the broker has devoted his time, labor, or money to the interest of his principal, as unsuccessful efforts, however meritorious, afford no ground of action. And it matters not that after his failure and the termination of his agency what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would never have met; he may have created impressions which under later and more favorable circumstances naturally lead to and materially assist in the consummation of a sale; he may have planted the very seed from which others reaped the harvest; but all that gives him no claim. It was part of his risk that, failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labor. To entitle a broker to commissions upon a sale or transaction which is actually consummated, he must show that his efforts and services were the *primary, proximate, and procuring cause thereof.*' And for this statement the author cites, among other cases Keener v. Harrod, 2 Md. [63], 70, 56 Am.Dec. 706; Tinges v. Moale, 25 Md. 480, 90 Am.Dec. 73; and Blake v. Stump, 73 Md. 160, 20 A. 788, 10 L.R.A. 103." (Italics ours.)

We discussed this question at some length in Jackson v. Northwestern Mutual

Life Insurance Co., 4 Cir., 133 F.2d 111. See the cases therein cited, and see particularly the extract therein quoted from Sibbald v. Bethlehem Iron Co., 83 N.Y. 378, 385, 38 Am.Rep. 441.

In the instant case, under the law just stated, we think there was not sufficient evidence to justify the submission of this question to the jury. The efforts of Erk, however vigorous and valiant, were too remotely connected in time, place, circumstance and causation, with the final securing of the contract between Turkey and Martin, executed in January, 1937, for the sale of the B10B planes.

At the date of the cancellation of the agency contract by Martin, negotiations between Martin and the Turkish Government had reached a stalemate. Turkey insisted upon speedy delivery which Martin could not make. Officials of the United States had flatly refused to release the B10B plane for sale to foreign governments and Turkey had completely lost interest in the B10 plane. Martin canceled the agency contract in June, 1935; the contract between Martin and Turkey was not executed (in spite of Martin's continuous solicitations) until January, 1937, an interval of about 18 months.

On this point, the evidence of Marshal Tchakmak, Chief of Staff of the Turkish Army, was quite unequivocal, when he testified:

"Negotiations were undertaken by the Government of Turkey with the Glenn L. Martin Company for the purchase *in 1935 of some of its latest model bombing planes. These negotiations were terminated because the Government of the United States would not permit the delivery of the type of plane which we desired to purchase within the time we wanted to have the planes.*" (Italics ours.)

Equally clear and convincing was the testimony of the Turkish Ambassador to the United States:

"Q. Now, Mr. Ambassador, was this letter of June 26, 1935, defendant's exhibit 10, sent by you to The Glenn L. Martin Company upon the instructions of your Government? A. Exactly, yes.

"Q. Did that letter call off and end all negotiations then or previously pending between the Turkish Government and The Glenn L. Martin Company with respect to the purchase of airplanes? A. Absolutely."

We do not think it necessary to labor this point much further. This was not the conventional case of the employment of an agent for the purpose of *finding* a purchaser. The potential purchaser here, the Government of Turkey, was well known in advance to both Martin and Erk. Erk's task was to *secure* a contract between Martin and Turkey. Under the express terms of the agency contract, Martin reserved "the right at any time, to carry on negotiations direct" with Turkey; and Erk's commissions (if any) were payable only "on business *secured*" by him, and these commissions were "due and payable upon the completion of each contract, after delivery has been effected, and payment thereon received." Erk, according to his testimony, did first interest Turkey in the Martin planes. But that was not enough. Erk (in Turkey) had practically nothing to do with the negotiations leading to the sale of the B10B planes to Turkey, on which he claims his commission. These negotiations were conducted in the United States between the Turkish Ambassador and high officials of Martin.

The judgment of the District Court is affirmed.

Affirmed.