## LEIMBACH et ux. v. NICHOLSON

(Two Appeals in One Record)
[No. 114, September Term, 1958.]

442

*Decided March 17, 1959.*

*Motion for rehearing filed and denied April 16, 1959.*
*Dissenting Opinion filed March 31, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*W. Hamilton Whiteford,* with whom were *Due, Nickerson, Whiteford & Taylor* on the brief, for the appellants.

*W. Lee Harrison,* with whom was *Richard C. Murray* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

In this case the plaintiff, appellee, brought an action in one declaration against two sets of defendants. The claim against Mark E. and Beatrice R. Gann was based on an alleged tortious interference with a contract between Nicholson and the Leimbachs. At the conclusion of the plaintiff's case the trial court granted the motion of these defendants for a verdict in their favor, and there was no appeal from the judgment entered thereon. The claim against the Leimbachs was for broker's commissions due upon the sale of the Leimbachs' farm property. At the conclusion of the whole case, the court denied a motion for directed verdict, and the jury brought in a verdict of $5,000. The court denied a motion for judgment *n.o.v.* and the Leimbachs appealed. Nicholson filed a cross-appeal, claiming that the jury should have been allowed to return a larger verdict predicated upon standard commissions.

The appellants make two contentions, that the evidence was legally insufficient to warrant the submission of the case to the jury, and that there was error in the court's charge. The first contention requires a rather detailed statement of the facts. It was shown that, in the summer of 1954, Nicholson, an experienced real estate broker, asked Leimbach if he would care to sell the farm where he resided; and although

Leimbach did not show much interest, he indicated that he would consider any offer Nicholson produced. Nicholson testified, but Leimbach denied, that an asking price of $150,000 was fixed, and there was an understanding that if Nicholson consummated a sale, he would receive the usual commissions. Leimbach testified, however, that Nicholson said he would charge a flat fee of $5,000. In August, Nicholson brought the Ganns to the property and showed it to them in the presence of the Leimbachs. Dr. Gann made an offer of $100,000, which Leimbach refused. Later in the fall, the Ganns again visited the property, accompanied by a Mr. Edward Myerberg, a licensed real estate broker and developer, who was a close friend and patient of Dr. Gann, and whose advice he sought. The Leimbachs were out of town at this time, but Leimbach learned of the visit subsequently. Dr. Gann, through Nicholson, submitted an offer of $110,000, which Leimbach refused. Nicholson testified that Leimbach said he would consider $125,000, but Leimbach denied that he ever agreed to accept such a figure.

In November, Nicholson submitted an offer of $115,000 on behalf of the Ganns, which Leimbach refused. Nicholson testified that Mrs. Leimbach was indignant that the Ganns had visited her house, and brought people in her house, when she was not there. She said it was a "Jew trick" and she did not want to sell to Jews. Leimbach testified Mrs. Leimbach had only said that the neighbors might object. However, Nicholson reported the remark to the Ganns, who were offended, and said they were no longer interested in buying. Leimbach testified that he told Nicholson later in that month that they had decided not to sell the place. He testified he did so because Nicholson had not been able to obtain an adequate offer, and not because of any racial or religious question. Nicholson did not specifically deny this, but testified that around Christmas Leimbach phoned him to inquire if the Ganns were still interested in buying the property. Leimbach denied having any communication with Nicholson after November. In any event, Nicholson discontinued his efforts to sell to the Ganns. In January, 1955, he tried to interest them in an adjoining property, in a letter (which Gann testi-

fied he did not receive) stating: "I do not know whether we are going to be able to get his [Leimbach's] place or not."

Dr. Gann testified that in March, 1955, a friend, Edward Myerberg, came to his office and told him "he had the opportunity of purchasing the Leimbach farm." Dr. Gann told him to go ahead, that he was not interested, but he doubted if he could buy it, as the Leimbachs had said they would not sell to Jews. Myerberg said he had no fears on that score. Dr. Gann said he had no fears either. Myerberg said he was thinking of buying the property as a home, moving his family there, and selling off part of the farm in lots. Early in April, the Ganns called at the home of the Myerbergs, and learned that they had made an appointment to visit the Leimbach property. At the invitation of the Myerbergs, the Ganns accompanied them to the Leimbach farm. Mr. and Mrs. Leimbach were at home, and were very hospitable and courteous. There is no testimony as to what matters were discussed at that time. On May 10, 1955, Myerberg asked Gann whether he would be willing to take the place if Myerberg's family decided not to move there. He told Gann the price was $122,500 plus a $5,000 commission to another real estate broker, Albert J. Strobel, Jr. Gann agreed to take it, if Myerberg did not. A contract of sale was signed by Myerberg and the Leimbachs on May 12, 1955. Myerberg insisted on a clause giving him the right to assign the contract without recourse. His explanation was that he would probably want to take title in the name of one of his development corporations. On May 20, 1955, Myerberg executed an assignment of the contract to the Ganns, but did not inform Leimbach of the assignment until four days before the settlement on July 12.

Leimbach testified that after the withdrawal of Gann's offer of $115,000 he had no further communications in regard to the property until the end of April, when he received a phone call from a broker, Strobel, who was a close personal friend. This, of course, is not consistent with Gann's testimony that he and Myerberg visited the property and talked to Leimbach early in April. Strobel told him he had a prospective purchaser who was familiar with the property. After

consultation with his wife, he called Strobel and put a price of $122,500 net on the place. Strobel told him that the prospect was Myerberg. Strobel had never shown the property to Myerberg, or to anyone else. At a luncheon meeting between Myerberg, Strobel and Leimbach the terms were agreed upon, and the contract of sale was drawn by their attorneys. Strobel died shortly thereafter.

There was testimony that Myerberg paid $5,000 to Strobel's firm at the time of settlement, although the contract of sale had been previously assigned. The sales price was listed as $127,500. No part of the commission was remitted to Myerberg or to anyone else. Dr. Gann testified he paid the full price for the farm, so evidently he reimbursed Myerberg for his down payment, and the payment of the commission.

We think the evidence was sufficient to show an initial employment of Nicholson by Leimbach. Employment may be implied from conduct, and need not be supported by evidence of a written, or even explicit oral, agreement. *Heslop v. Dieudonne*, 209 Md. 201, 206; *Glaser v. Shostack*, 213 Md. 383, 387; Code (1957), Art. 2, sec. 17. The fact that a sale is consummated by the owners without the participation of the broker is not decisive. *Cowal v. Marletta*, 216 Md. 222, 226. The broker must establish, however, that he is the primary, proximate and procuring cause, and it is not enough that he may have planted the seed from which the harvest was reaped. *Keener v. Harrod*, 2 Md. 63, 71; *Attrill v. Patterson*, 58 Md. 226, 251; *Way v. Turner*, 127 Md. 327, 328; *Tahir Erk v. Glenn L. Martin Co.*, 143 F. 2d 232, 235 (C. C. A. 4th Cir.). Cf. *Steele v. Seth*, 211 Md. 323, 328, and cases cited. In the instant case it is clear that Nicholson did not produce a purchaser ready and willing to buy at a price satisfactory to the owners. The best offer he was able to obtain was $115,000, less a commission of $5,000. The sale effected was at a price of $127,500, or $122,500 net to the owners. In short, Strobel, or Myerberg, succeeded, where Nicholson had failed, in procuring the end result. Nicholson did not have an exclusive agency. The contract was uni-

lateral, to pay commissions only if he produced a purchaser ready and willing to meet the owners' price.

It is of course true that an owner may not take advantage of a broker's services to secure a prospective purchaser and then deprive him of his commissions by selling directly to his client at a price less than the broker could sell under his authority, particularly where the authority is unrevoked. *Cowal v. Marletta, supra,* and cases cited. In such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned. In the relatively few cases in which the sale has ultimately been made through other means at a higher price, and where there was no prospect of success when negotiations through the first broker terminated, it has been held that the dual inference, first, that the first broker was the procuring cause of the sale, and second, that the sale at a higher price was a subterfuge to defeat the first broker's right to commissions, does not arise. See note, 27 A. L. R. 2d 1348, 1430. See also, *Richards, Inc. v. Shearer,* 186 Md. 36, 40; *Murphy v. Linsky* (Conn.), 109 A. 412; *Rosenfield v. Wall* (Conn.), 109 A. 409; and Williston, *Contracts,* (Rev. Ed.) § 1030A. The *Murphy* case suggests that the rule might not have been applicable if, as the broker there contended but failed to show, the buyer was desirous of purchasing the property and was willing, even before the broker's efforts ceased, to pay the price which he subsequently did pay. In the instant case we find no evidence to support such a possible exception, nor do we find any facts similar to those involved in *Goodman v. Marcol, Inc.* (N. Y.), 184 N. E. 755 or in *McCarthy v. McCarthy* (R. I.), 142 A. 142, both cited in the above note in 27 A. L. R. 2d at pp. 1430 and 1373, respectively. Nor do we think that there is any evidence upon which it could reasonably be supposed that the Leimbachs injected their religious affiliation objection for the purpose of defeating Nicholson's right to commissions.

The appellee contends that the revocation of his authority was not made in good faith in that the conduct of the owners

frustrated his further efforts. It is clear that an owner may terminate a unilateral contract of employment at will, and without assigning any cause, good or bad, prior to the production of a purchaser ready and willing to buy on terms satisfactory to the owner. See Restatement, *Agency* (2d Ed.) §§ 445, comment c; 448, comment d; 449, comment a; 453, comments c and d. On the other hand, it has been held that a termination in bad faith will not defeat a right to commissions. *Steele v. Seth, supra; Clark v. Banks,* 158 Md. 24, 27. But the term "bad faith", in this connection, imports a termination for the purpose of defrauding the broker, after his efforts have put the owner in a position to close the sale on substantially the terms stated. If the broker has not met the condition of his employment, the owner is not precluded from seeking other assistance by means of which a sale is ultimately effected on terms more favorable to him, even though to the same prospect introduced by the first broker. See *Ebling v. Brewer,* 154 Md. 290, 298, and cases cited; *Way v. Turner, supra; Richards, Inc. v. Shearer, supra.* See also *Robinson v. Kemmons Wilson Realty Company* (Tenn.), 293 S. W. 2d 574, and *Taylor v. Vestal* (Mo.), 304 S. W. 2d 820.

According to Leimbach, the employment was terminated in November, when he refused Dr. Gann's offer of $115,000. He did so because Nicholson had not procured a satisfactory offer. He heard nothing further from Nicholson until after he had signed the contract of sale at a net price to him of $122,500, in response to inquiries and a satisfactory offer from Strobel. There is no suggestion that at the time of termination Leimbach had any intention of resuming negotiations with the Ganns. If Leimbach's testimony on this point is disregarded (and, of course, the jury could disregard it) and if Nicholson's statement is accepted that Leimbach authorized the renewal of negotiations at about Christmas time, 1954, it is clear from Nicholson's testimony and from his letter of January 13th that his efforts to sell to the Ganns ceased at least after January 13, 1955. Whether this cessation was because of Mrs. Gann's refusal to go on with negotiations because of fear of further humiliation or because Nichol-

son felt it useless to attempt to meet Leimbach's ideas as to price, or was due to both factors (and either or both reasons are compatible with Nicholson's testimony), Nicholson wrote the Ganns on January 13th that he didn't know whether they could buy the property or not, and, so far from inviting further offers, tried to interest them in another property. In any view of the case, the end product of his efforts was hostility, which he did not seek to resolve, and a breakdown of negotiations, in which he acquiesced. The ultimate contract was conducted in a different atmosphere. Strobel, or Myerberg, succeeded in resolving the hostility and closed the sale at a much higher figure.

For present purposes, we need not discuss at any length the appellee's contention that Myerberg was acting throughout as the agent of Dr. Gann, and that Leimbach knew or should have known this. Myerberg seems to have acted the part of a bellwether, since Dr. Gann evidently felt that if Myerberg was willing to buy at the enhanced price, the price was right. But if we assume that he was acting for Dr. Gann, neither he nor his principal had any obligation to deal through Nicholson. Even if we assume, without deciding, that the evidence would permit an inference that Leimbach knew Dr. Gann was the real purchaser, the case is not altered. As we have said, the circumstances of the instant case do not permit an inference that Nicholson had earned his commissions at the time his employment was terminated or abandoned, so as to preclude a sale at a higher price to the Ganns, or to their agent, without liability to Nicholson on the part of the appellants.

In view of our conclusion on this point, it is unnecessary to pass on the correctness of the charge, or the question raised in the cross-appeal as to the amount of the commissions. Because of deficiencies in the appellants' record extract, supplied by the appellee, we think the costs should be paid by the appellants. Rule 828 e.

*Judgment reversed, costs to be paid by the appellants.*

HAMMOND, J., filed the following dissenting opinion, in which PRESCOTT, J., concurred.

I do not challenge the proposition that an owner of property may himself negotiate with, and sell to, a prospect brought to him by a broker, without having to pay commissions in either of two situations—if he has previously terminated the authority of the broker in good faith or if the broker has voluntarily abandoned the undertaking. The owner cannot escape commissions if he discharged the broker in bad faith to avoid payment of commissions, or if he wrongly compelled or induced the broker to withdraw.

I dissent earnestly from the finding of the majority that, as a matter of law, the broker in this case was not the procuring cause of the sale to the ultimate purchaser because, as a matter of law, the owner had in good faith discharged the broker or the broker had withdrawn voluntarily. The testimony and the inferences it clearly permits allow a finding to the contrary on all points.

Almost always the questions of procuring cause, good faith, and voluntariness of abandonment are for the jury, even though the owner deals with, and sells to, the prospect direct or through another broker. *Steele v. Seth*, 211 Md. 323, 330-331; *Howard v. Street*, 125 Md. 289; *Clark v. Banks*, 158 Md. 24; Mechem, *Agency*, (2d Ed.), Secs. 2435 and 2442. This almost necessarily must be the case where the broker admittedly brings to the owner a hitherto unknown prospect, who makes increasing offers until one is accepted.

The majority opinion recognizes that the owner may not deprive the broker of commissions by selling direct to his prospect at a lower price than the prospect had offered through the broker, for "in such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned." But they say that where the sale is at a higher price, the dual inferences that the broker was the procuring cause and of bad faith do not arise. I do not find the distinction relied on by the majority, as the very basis of the decision, to be made by the writers or the Courts. The

texts and the cases say that the decisive inquiry is good faith or bad faith, or reasonableness or arbitrariness, whether the sale be for a higher or a lower price. Mechem, *op. cit.*, Sec. 2437, pp. 2034-2035. In 12 C. J. S., *Brokers,* Sec. 86 b, p. 197, it is said: "More specifically, a broker who is the procuring cause of a transaction consummated by the principal is entitled to a commission, even though the principal accepts property in lieu of cash, makes a sale at a higher price or on better terms than he had authorized, or sells at a lower price than that originally quoted by him to the broker * * *." The cases support the text. *O'Connell v. Casey* (Mass.), 92 N. E. 804 (Broker's offer $15,000—price accepted $18,000); *McCarthy v. McCarthy* (R. I.), 142 A. 142 ($6,000-$6,500); *Holland v. King* (Ga.), 33 S. E. 2d 275 ($11,000-$12,500); *Cole v. Crump* (Mo.), 156 S. W. 769, 770 ($60 an acre-$65 an acre); *Flournoy v. Atlas Oil Co.* (La.), 91 So. 714 ($185,000-$200,000); *Darnell v. Smith* (Miss.), 76 So. 547 ($7,500-$8,250); *Goodman v. Marcol, Inc.* (N. Y.), 184 N. E. 755 ($177,500-$180,000); *Murphy v. Linsky* (Conn.), 109 A. 412. I read the Maryland law as in accord. In *Howard v. Street, supra,* 125 Md. 289, the broker's offer was $30,000, and eleven months later the owner accepted directly from the same prospect $47,000, of which, by agreement, $30,000 was allocated to the land. The questions of good faith and procuring cause were held to be for the jury. In *McLean v. Peyser,* 169 Md. 1, 9, the offer to buy physical assets was changed to an offer to buy capital stock and assume debts, and the Court said: "The fact that the offer so secured and accepted may have been changed or modified before final acceptance of the purchaser by the seller would not deprive the broker of the right to his commission if he was the procuring cause of the offer so made and accepted."

The majority opinion goes on to suggest that, in any event, there was no evidence to support what is called "a possible exception" to the rule of greater price there relied on—that is, no evidence that the Ganns were desirous of purchasing the property and willing, before the broker's efforts ceased, to pay the price they finally paid. There was testimony that

showed, or permitted the clear inference, that the Ganns had fallen in love with the Leimbach place, that they were not and could not be interested in any other, that Dr. Gann took Myerberg to the farm on his second visit in the fall of 1954 to get his expert opinion on the value of the place and how much to pay for it, that later, with no change in conditions, it became known that Myerberg felt $122,500 to Leimbach and $5,000 commission was a fair price to pay, that Dr. Gann told Myerberg he would take the place if Myerberg did not at whatever price Myerberg agreed on, and that when the final price was quoted to him Dr. Gann accepted instantly, without batting an eye or consulting Mrs. Gann. It is difficult to see how circumstantial evidence of desire to buy and willingness to pay the necessary price could be clearer or more persuasive. In any event Leimbach, who originally put a price of $150,000 on the place, finally sold it for $122,500 net. The situation is analogous to that in *Stokes v. Wolf*, 137 Md. 393, 412: "The testimony was that when Wolf was employed he was told that his employer wanted $650,000, but that this price could be reduced and that amount was named tentatively and not as a conclusive or final selling price, and later on his employer did agree to sell it to persons brought to him by the appellee for $615,000. Wolf was not employed to procure a buyer who would pay $650,000 for the hotel, but to procure a purchaser who would buy it at a price fixed by and satisfactory to his employer. Under such circumstances it cannot be seriously contended that he was not employed to sell the property for the amount which his employer agreed to accept for it."

In determining whether a defendant is to be let out as a matter of law the Court must accept as true all testimony and inferences fairly flowing from it, favorable to the right of the plaintiff to recover. In finding as a matter of law that the Ganns were neither desirous of buying nor willing to pay the necessary price the majority, it seems to me, applied the rule in reverse and gave the defendant owner the benefit of the assumptions of truth of favorable evidence. The same thing can be said of the rejection by the majority, as a matter of law, of the broker's contention that the agency was

never terminated and never abandoned but merely was frustrated by the owner's arbitrary, if not *mala fide,* misrepresentation that he would not sell to the Ganns because they were of the Jewish faith.

The testimony and its reasonable inferences allowed these findings: That when $115,000 was offered for the place, the owner told the broker that he would not sell to Jews and that Nicholson told this to the Ganns; that in spite of this flat statement in the fall of 1954 (and in the face of the owner's testimony that he had earlier finally discharged the broker), the owner called Nicholson after Christmas to see if the Ganns still were interested; that when Nicholson talked and wrote to the Ganns (as late as January, 1955), they said they would not deal further for fear of being humiliated (Dr. Gann said he did not want to make Leimbach tell him the same thing to his face); that the broker did not go back to the Ganns after the $115,000 offer was rejected because of what Dr. Gann told him about being humiliated; that Leimbach's real refusal was insufficiency of price; that he was entirely willing to sell to a Jewish buyer who would pay his price; that in order to receive that price, Leimbach entered into an arrangement with Myerberg, whom he knew, and Strobel, a broker who was Leimbach's lifelong friend and a friend of Myerberg, to get the Ganns to pay that price without giving a commission to Nicholson.

If the efforts of the broker Nicholson to consummate the purchase by the Ganns were frustrated by the owners, the Leimbachs, arbitrarily or capriciously, that is, if the cessation of activity by the broker, his claimed withdrawal, or abandonment of effort were induced by misrepresentation of the owners, they are liable to him for commissions if the sale was to the Ganns, the prospects of the broker. The principle is like that applicable in cases where the owner arbitrarily or capriciously refuses to consummate an agreed to sale. *Mc-Lean v. Peyser, supra,* 169 Md. 1, 10-11; *Richards v. Jackson,* 31 Md. 250; *Melvin v. Aldridge,* 81 Md. 650, 658; *Carrington v. Graves,* 121 Md. 567, 570. In such case the owner is liable for commissions. Or, as the Court of Appeals of New York put it in *Goodman v. Marcol, Inc.* (N. Y.), *supra,*

184 N. E. at page 756, the broker does not lose his commissions if his efforts "are rendered a failure by the fault of the employer" for "no one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance."

The owner, Leimbach, through his able and experienced counsel, admits the proposition just discussed. In his brief he says that Nicholson stopped trying to sell to the Ganns because of the attitude of the Leimbachs towards Jewish people and that this may be assumed to be an insufficient and improper reason for the Leimbachs to refuse to negotiate further with the Ganns through Nicholson, and adds: "If the Leimbachs had indeed negotiated and sold to the Ganns at a later date, the argument would be untenable that they' owed Nicholson no commissions because his agency had not been terminated and that he was not the procuring cause of the sale by the Leimbachs to the Ganns."

The concession is but a candid appraisal of the controlling law which is well expressed by the Supreme Judicial Court of Massachusetts in *O'Connell v. Casey,* cited above (at page 807 of 92 N. E.) : "Where the evidence warrants the jury in finding that the negotiations had progressed to such a point that a revocation of the broker's authority (if his authority is revoked) is made in bad faith, the question of the plaintiff's being the efficient cause of the trade subsequently made does not arise. The fact that through the broker's efforts the negotiations have reached the point where it can be found that his authority, if revoked, has been revoked in bad faith, is of itself a finding that he found the customer for his principal if his principal finally agrees on a price with the customer found by the broker. It is no part of the broker's duty to see to the making of the contract between his principal and the customer found by him."

The decisive question, then, becomes not that of procuring cause or of good faith, but whether the owner knew or should have known that he was selling to Gann. Again, the testimony and fair inferences permit, if they do not indicate a finding, that he did. Leimbach knew that Myerberg was the friend and adviser of the Ganns, that he had visited the place only with

the Ganns, that Myerberg was a licensed broker and that Strobel, the third broker, had no part whatever in finding or influencing Myerberg to buy. He must have known that there could be no need nor possible use for importing Strobel into the transaction if Myerberg was going to buy for himself. The contract presented to Leimbach in express terms permitted Myerberg to assign the contract to any individual without further liability to Myerberg.

The facts before the experienced Leimbach were such as to put any reasonable person on notice that the real purchasers in all probability were the Ganns, and his sale with this imputed knowledge would make him liable for commissions. *Zellan v. Winston* (Mun. Ct. of App., D. C.), 108 A. 2d 163. It is undisputed that four days before signing the deed Leimbach knew the Ganns were the buyers. The conveyance with this knowledge would make him liable. Restatement, *Agency*, (2d Ed.), Sec. 448, comment f, illustration 12.

That the Ganns were always the real purchasers could be deduced from the facts that Myerberg, knowing his family did not want to move to the farm, would not buy until Dr. Gann agreed to take the place from him, the visit to the farm by the Myerbergs and the Ganns together in April of 1955 just before the contract was signed, the assignment clause in the contract, and the assignment.

It is clear to me that the case was one for the jury.

Judge Prescott has authorized me to say that he concurs in the views herein expressed.