# HAMPTON PARK CORPORATION *v.* T. D. BURGESS COMPANY, INC.

[No. 31, September Term, 1973.]

*Decided November 9, 1973.*

The cause was argued before BARNES, McWILLIAMS, SINGLEY, SMITH, and LEVINE, JJ.

*Edward L. Genn,* with whom were *Benjamin B. Brown* and *Yale L. Goldberg* on the brief, for appellant.

*Leo Wm. Dunn, Jr.,* with whom were *Nylen & Gilmore* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal stems from a case tried without a jury in the Circuit Court for Prince George's County (Bowie, J.), which resulted in a judgment in the total sum of $213,159.10, including interest, against appellant, Hampton Park Corporation (Hampton Park). The judgment was recovered by appellee, T. D. Burgess Company, Inc. (Burgess), which had sued Hampton Park for a real estate broker's commission alleged to have been earned for selling a parcel of land owned by Hampton Park to the United States Government. With limited exceptions, which we shall note later, the material testimony in this case is undisputed.

Being desirous of acquiring a large parcel of land in Prince George's County for the purpose of building a bulk mail facility, the Post Office Department, as it was then known, entered into a contract on June 2, 1969, with a New York firm known as Drake Sheahan/Stewart Dougall, Inc. (Drake Sheahan). The latter is a marketing and physical distribution consultant. In addition to conducting a study of "present and projected mail flow in the Washington, D. C. area" for the purpose of determining "if there is a need for major new facilities in the area," Drake Sheahan was to chart the patterns of mail flow, evaluate plans for future facilities, develop specifications for recommended facilities and review the effect of transportation patterns upon the volume of mail handled in the Washington area. Also it was to undertake the following:

> "5. *The development of the criteria for selecting sites.* The contractor [Drake Sheahan] shall provide a description of the factors to be considered. These shall include, but not be limited to, the needs of transportation, site size, personnel access, mail flows, service, land cost, prevailing

wage rates, labor availability and community characteristics.

"6. *Recommended sites in priority of their desirability.* The final selection of a site, or sites, if they are required, will require *negotiations by postal officials.* Therefore, the contractor, working with local and regional postal officials, shall provide a priority listing of potentially available sites *to form the basis for negotiation.*" (emphasis added).

In pursuance of the part of the study related to the proposed bulk mail facility, Drake Sheahan was referred to Burgess. A representative of the former, one A. L. Lowe (Lowe), called on Burgess in late October 1969 for the purpose of visiting prospective sites. Mr. T. D. Burgess, president of the company, delegated the assignment to Frank Principe, vice president, and his son, John Principe, a salesman in the firm. Burgess thereupon proceeded to obtain from Hampton Park, which was then known as The Jean Corporation, a listing agreement which reads as follows:

"As owners and developers of an industrial complex at the intersection of Central Avenue and the Capital Beltway, we authorize your firm to offer for sale, subject to prior sale, properties contained within this industrial complex. We agree to pay you a commission of six per cent (6%) of the total sales price for any properties *sold by you.*

"It is our understanding you are now offering to the U.S. Post Office a parcel containing approximately 40 acres. We agree, in the event the above-said firm elects to purchase in said industrial complex, *as a result of your efforts* to pay you your full commission amounting to six per cent (6%) of the total sales price irregardless [sic] of any claims by others." (emphasis added).

In early November, the Principes met with Lowe, Burder Smith Athey (Athey) of the Washington, D. C. Post Office,

and J. Kevin Malloy (Malloy), vice president and secretary of Hampton Park. It is undisputed that this was the first occasion on which Malloy had met anyone from the Post Office Department in connection with the purchase of any land owned by Hampton Park; and it is equally undisputed that this was the first time anyone from Drake Sheahan had ever met Malloy. On this occasion, Lowe expressed an interest in parcels of approximately 40 acres in size, with industrial zoning, close to the Capital Beltway (Interstate 495) between Pennsylvania Avenue and Route 50. Malloy then indicated that Hampton Park's 350-acre industrial park complex — located within the area designated by Lowe — included at least one tract which met the requirements of the Post Office Department. The Hampton Park property is located at the Beltway and Central Avenue in Prince George's County.

Subsequently, a description of the Hampton Park site and its favorable characteristics — prepared by Malloy with some assistance from John Principe — was mailed to Drake Sheahan. In the ensuing months, the Principes furnished Lowe with additional data and documents pertaining to the Hampton Park property. On at least one other occasion, John Principe revisited the Hampton Park site with Lowe and Athey. In addition, he showed them three other parcels, none owned by Hampton Park, all of which were located within the preferred area. Throughout this period, the Principes remained in communication with Malloy.

On March 6, 1970, Drake Sheahan submitted its report entitled "Proposed Bulk Mail Handling Plant" to the Post Office Department. As the contract had contemplated, the report dealt with a number of subjects: The Washington area mail volume; mail flow; space requirements; available site and property costs; mechanization and cancellation costs; and a variety of economic analyses projections.

On May 1, 1970, one Earl S. Godfrey (Godfrey), employed in the real estate division of the Post Office Bureau of Facilities, was given the assignment of investigating property sites for the proposed bulk mail facility. He "was

given a preferred area within which to survey, and criteria for the sites as far as size and so on was concerned." This was furnished to him in the form of a three-page extract from the Drake Sheahan study. It may be described as sketchy and merely states:

> "The weighted center of gravity of the Washington, D. C. Bulk Mail Facility Service Area is approximately four miles southeast of Alexandria. This area, however, consists of national parks and memorials and cannot be considered as a site for the BMF [bulk mail facility].

> "The recommended area for the Washington, D. C. BMF is the Beltway (I-495) between Route 50 and Marlboro Pike (Pennsylvania Avenue). This area provides ready access to Baltimore, Richmond and Norfolk, and southwest Virginia via the Beltway. Washington, D. C. parcel post delivery operations are also acceptable from this area.

> "This area also has good access to existing piggyback ramp yards in Washington. It may be possible to have additional pig facilities at the Penn Central Yards at Route 50 and the Beltway.

> "Five available sites which have been developed in the recommended area are listed below *in priority order*. A minimum of 50 acres is recommended for the site. If other properties are developed they should be considered along with the attached list." (emphasis added).

Attached to this is a superficial map of the metropolitan Washington area with the five locations indicated thereon, and listed at the bottom in this manner:

> "1. Forestville Road  
> Marlboro Pike  
> #495 Beltway  
> "2. Westphalia Road  
> Penn. Ave.  
> #495 Beltway  
> "3. Pa. Ave. Industrial Park" (emphasis added).

> *4. Central Ave.*  
> *#495 Beltway*  
>
> 5. Route #50  
> #495 Beltway

The same list appears on the third page with the available acreage of each location and the land cost per acre.

When Godfrey received his assignment on May 1, 1970, he was directed to submit his recommendations for a site by May 15. He therefore immediately recruited a five-man team of real estate specialists from the Washington Regional Office of the Post Office Department. He instructed those personnel to promptly survey the area designated in the Drake Sheahan extract by obtaining zoning maps, traffic counts, assessment maps, zoning regulations, building codes; and to consult various public agencies. They were also to check recent land sales in the area.

Approximately three days after receiving his assignment, Godfrey, in the company of a member of his team, made an unannounced visit to Malloy's office. Upon entering, as Malloy describes it, Godfrey proclaimed, " 'I want to inform you I am here as a result of certain studies and surveys *I am doing* with respect to locating a site for the Post Office Department for [a] bulk mail facility.' " (emphasis added). Aware of the activities previously engaged in by the Burgess office and its dealings with Lowe, Malloy questioned Godfrey closely:

> "So, I said, 'Have you ever heard of the T. D. Burgess Company?'
>
> "And he said, 'No; I haven't.'
>
> "I said, 'Have you ever heard of Mr. Athey?'
>
> "And he said, 'No, sir; I haven't.'
>
> "And I asked him if he ever heard of Mr. Lowe.
>
> "He said, 'No, sir; I haven't.'
>
> "And he asked me who they were.
>
> "So, I told him. I said, 'They are some people who had been working on a survey or a study of my ground previous, prior to this time.'
>
> "And he said, 'Well, I don't know those gentlemen.'
>
> "So, I could not remember what depart-

ment Mr. Athey was with. All I knew he was in the Post Office Department.

"So, he said, 'Well, I will find out what Mr. Athey has done, and in the mean time let's get down to business.'

"Mr. Godfrey got right down to business."

After Malloy recounted the activities engaged in by Lowe and the Principes, Godfrey communicated with Athey, and asked him to "bring whatever material he had." A day or two later, Athey delivered to him several papers. They consisted of letters written to Lowe by the Principes, which contained information pertaining primarily to the subject property, but which included references to other parcels shown to Lowe by the Principes.

In his first visit to Malloy, Godfrey stressed that he had been designated as the sole Bureau of Facilities representative of the Post Office Department; and, indeed, that it was the practice of the Post Office Department not to deal through real estate brokers. He testified, in effect, that prior to May 1, 1970, he had done no real estate surveying in Prince George's County, and knew nothing about any industrially-zoned sites there.

In his subsequent report to the Post Office Department, Godfrey made a prefatory reference to the general criteria suggested by the Drake Sheahan study. He testified, however, that the study was not a primary factor in his recommendation that the Post Office Department acquire the subject property. Godfrey explained that:

" ... The *main purpose of the Drake Sheahan report was to provide transportation data to the Postal Service* and as a side aspect of the contract having identified what the volumes were going to be for the various bulk facilities, and considering then where these volumes of mail were coming from and going to, of designating the general location for the Bulk Mail Center.

"In addition to that then they were asked to

indicate locations that would be appropriate for the Bulk Mail Center. So, the report goes on and designates five literally intersections as what they are, because while they are referred to as sites number one through five, again the information that was available to me was strictly what is here, and *there is no information beyond the intersections.* It was up to us, certainly, to guess what sites were intended by these locations. And there is no indication of the owners, as an example. The only one that comes close to an owner is the one referred to as the Pennsylvania Avenue Industrial Park.

"So, these were located upon as certainly areas that we should look at. And, of course, I must say these are the intersections between U. S. 50 and Pennsylvania that can be considered. So, *what they have done is to say each of the intersections along the Beltway should be looked at.*" (emphasis added).

He also testified that the information contained in the other papers he first received from Athey two days after initially calling on Malloy, was already known to him before he made that visit; "or would have been the kind of information that normally would have been acquired."

Godfrey particularly stressed that the Hampton Park property had been "identified as a potential site" before he received the material from Athey; and that it merely confirmed what was already obvious to him. The thrust of his testimony was that he learned of the site and called on Malloy as the result of his own investigations and the reports compiled by his own five-member team. It was those reports which disclosed that the Hampton Park property was the largest undeveloped industrially-zoned area "on the Beltway" between Route 50 and Pennsylvania Avenue; and that it was "inside" the Beltway, which was of material significance in connection with the existing "sewer moratorium."

During the month of May, following Godfrey's first visit,

Malloy spoke to the Principes, and informed them of Godfrey's arrival on the scene. He also related Godfrey's claim that his presence was in no way connected with the Drake Sheahan study; and that Godfrey would not deal through the Burgess office. Malloy also reported that after he had repeatedly questioned Godfrey whether he had ever heard of the Burgess firm, the former acknowledged that some Burgess correspondence was included in the Drake Sheahan material. It is at this point that the only real conflict in the testimony emerges. The Principes insist that in the same discussion, Malloy also went on to reassure them in this manner: " 'Don't worry about it. I will recognize you as the agents. You will get your commission.' " Malloy, on the other hand, denies making any such statement. They also quote him as saying: " 'I have got everything under control, and just let me handle it from here[.]' " Malloy acknowledges that he said to the senior Principe: " '[Y]ou haven't earned a commission in this case; however, you did go to time and trouble, you exerted some effort, you were trying to do your job, and I want to pay you something for it.' " In essence, his announced position then, as it has been at each stage of the proceedings, was that the Burgess efforts had been aimed at the wrong people; and that other than the extract, Burgess had no connection with Godfrey who was the key to the sale.

While the Godfrey-Malloy negotiations were fermenting, the Principes complained to Malloy that they were not being permitted to participate in the efforts to complete the sale. It was then, they say, that he reassured them about being paid a commission. Malloy acknowledges using at that point in his communications with the Principes the expression, "Don't rock the boat." But, as he says, this was only after the Principes spoke of inciting the District of Columbia Postmaster, Carlton Beall, and other persons in the political spectrum, to apply pressure through such channels in an effort to further the sale.

After Godfrey recommended the Hampton Park site, he expended additional efforts in gaining approval, not only of the Assistant Postmaster General in charge of the Bureau of

Facilities, but from the various planning agencies that exercise jurisdiction in such matters on the county, state and federal levels. Ultimately, after extensive negotiations between Malloy and Godfrey, the purchase was approved in the amount of $3,290,000; and the property was conveyed in July 1971.

Another witness from the Post Office Department, David A. Reedy (Reedy), also testified. As Assistant Program Manager for the postal region that included the Washington, D. C. area, he was designated by his supervisor to be a member of Godfrey's "site selection team for the Bulk Mail Facility." His "office was responsible for the coordination of all real estate and leasing and construction activities within the Postal Service . . . for our particular regions." He described the additional investigations of the subject property conducted after Godfrey had actually made his recommendations; these accounted in great part for the one-year delay between Godfrey's recommendations and the ultimate decision by the Assistant Postmaster General. Reedy also explained:

> "The Drake Sheahan report was *one* of the sources we used for identifying at various stages site areas or sites. The Drake Sheahan report was used to determine the area in which the bulk facility should be located.
>
> "Now, by area what I mean is take the Beltway as a pie, which piece of pie it should be in. If this whole general area were taken in that way, the Drake Sheahan report itself further identified some areas . . . that were [not] . . . built up, they were empty, and they were probably generally available for proper zoning. *It did not identify the specific sites themselves, it identified areas,* and this particular site was identified as an available area, Central Avenue and Forestville Road." (emphasis added).

Further, with respect to the role played by the Drake Sheahan study, he testified:

"The Drake Sheahan report was one of many things taken into consideration in making the decision. The Drake Sheahan report itself was no more significant than other documents, other investigations, that were done independent of it, investigations we ourselves did. It was one of the documents, one of the pieces of material, that was evaluated.

*"The main thought of the Drake Sheahan report was the location of the facility between Pennsylvania Avenue and Route 50 on the Beltway."* (emphasis added).

At the conclusion of the evidence, Judge Bowie, ruling from the bench, found that Burgess was the "primary, proximate procuring cause of the sale." He did so after concluding that had the Principes not been barred from participating in negotiations, they could have effected the sale themselves. It is interesting to note that while the court expressly found that the Principes and Malloy were all direct, straightforward and truthful as witnesses, it apparently resolved the only disputed testimony of any significance, *i.e.*, the alleged assurance that Burgess would receive a commission, in its favor.

On appeal, Hampton Park vigorously attacks the judgment entered below on several grounds:

1. That the court erred in concluding that the broker was the procuring cause of the sale.

2. That the listing contract is void and unenforceable because it is against public policy.

3. That the broker is precluded from recovering compensation because it violated its fiduciary duty to its principal by offering the property to Drake Sheahan at a price lower than authorized; by showing another site to Lowe in which the broker had made an investment; and by offering other sites without revealing this fact to its principal.

4. That the listing agreement is invalid, and thus

unenforceable, since it provides for neither time limitation, price nor description of the property to be sold.

5. That the court erred in making a number of rulings upon the testimony.

6. That Hampton Park was entitled to a jury trial notwithstanding its failure to request one within the time specified by Maryland Rule 343.

In the view we take of this case, it is only necessary that we discuss the first issue, since we have concluded that the trial court erred in adjudging the broker to be the procuring cause of the sale. In this connection, a brief reference to the listing agreement is in order. At one point, it provides for a commission "for any properties sold by" the broker. Elsewhere, it does so if the property is sold "as a result of your [the broker's] efforts." With the acquiescence of the trial judge, both sides approached the case below on the premise that the language of the listing agreement requires Burgess to establish itself as the "primary, proximate and procuring cause" of the sale. They have adhered to this test in this Court, and we shall do likewise. Because of the unique factual situation presented here, however, resolution of this case compels a further examination of this test.

Long ago, in *Keener v. Harrod*, 2 Md. 63 (1852), our predecessors declared:

" ... We understand the rule to be this, (in the absence of proof of usage,) that the mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together, to treat, will not entitle him to compensation; but, if it appears that such introduction or disclosure was *the foundation on which the negotiation was begun and conducted, and the sale made*, the parties cannot afterwards, by agreement between themselves, withdraw the matter from the agent's hands, so as to deprive him of his commission. (citations omitted) .... " 2 Md. at 71 (emphasis added).

That rule was reaffirmed in *Jones v. Adler*, 34 Md. 440,

443 (1871), and has since been consistently followed in a line of cases too numerous to list here. We also held in *Cowal v. Marletta*, 216 Md. 222, 139 A. 2d 712 (1958) that:

> "The question of whether a broker's efforts are the procuring cause of a sale is not to be determined by whether his services are slight or extensive but rather on the basis of whether the efforts he did make were in fact the *proximate cause of interesting the purchaser, and his ultimate agreement to buy. . . .*" 216 Md. at 228 (emphasis added).

In *Bearman v. Roland Park Co.*, 218 Md. 515, 147 A. 2d 697 (1959), we went on to say:

> " . . . One satisfies the legal test as a procurer of the purchaser if the testimony permits the inference that *the sale was accomplished as a result of his action* in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations. (citations omitted)." 218 Md. at 518-19 (emphasis added).

Later, we reaffirmed that statement in *Sanders v. Devereux*, 231 Md. 224, 231, 189 A. 2d 604 (1963). But, we also said there that while "the owner cannot take advantage of a broker's services and make the sale himself, or through another broker, so as to deprive the broker of his commission when he has introduced a prospective buyer to the seller," the negotiations conducted by the broker must "have progressed to a point where success seems imminent," 231 Md. at 231-32.

What all this continues to mean, as we said in *Balto. Car Wheel Co. v. Clark*, 131 Md. 513, 104 A. 357 (1917), is that:

> " . . . '[T]o entitle a broker to recover commissions for a sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase *was accomplished as the result* of such

efforts or negotiations.' . . ." 131 Md. at 516 (emphasis in original).

In the final analysis, the broker must establish that he is the primary, proximate and procuring cause of the sale, *Leimbach v. Nicholson*, 219 Md. 440, 446, 149 A. 2d 411 (1959); and it is not sufficient that the broker has merely "planted the seed from which the harvest was reaped," *Sanders v. Devereux, supra,* 231 Md. at 231; *Leimbach v. Nicholson, supra*, at 446.

The broker's contention that it has met the test reflected by our prior decisions is bottomed on the following rationale, also adopted by the trial judge: That the arrival of Godfrey on the scene, and the subsequent negotiations culminating in the sale, were the result of the broker's efforts in dealing with Lowe and Athey. It is on this critical point that we disagree. Otherwise put, the key to the broker's claim is that the activities of the salesmen were the "primary, proximate and procuring cause of the sale" recommended by Godfrey to the Assistant Postmaster General. Plainly, they were not.

The result likely would have been different if the salesmen's efforts had been conducted in relation to Godfrey or any of his "team" members; or if Lowe and Athey had been authorized to conduct the actual negotiations; or, more to the point, if the three-page extract, such as it was, had truly bridged the gap between the broker's activities and the purchase.

The evidence, however, does not allow any of these conclusions. This is established by the extract itself, which is the only connection with the Burgess office acknowledged by Godfrey. He conceded that the Drake Sheahan file contained certain papers and data which had been submitted by Burgess. But, he testified without contradiction that he and his team members had already compiled the same information by their own investigations before he [Godfrey] had ever become aware of the Drake Sheahan file and had made his first visit to the Hampton Park office. This evidence, as we have already noted, is uncontradicted; and there is none which permits an inference to the contrary.

This fact was further confirmed by Athey whose deposition was read into evidence. He was merely identified as the coordinator between the Post Office Department and the Drake Sheahan study. He provided the euphemism for his title, "coordinator," when he referred to himself as Lowe's "chauffeur." Clearly, his role furnishes no connection between Burgess and the purchase of the property. In short, as Hampton Park contends, the Burgess efforts were directed towards the wrong people in terms of establishing it as the "primary, proximate and procuring cause" of the sale. It is also important to note, as reflected by the uncontradicted evidence, that Godfrey's recommendation was instrumental in the ultimate decision to purchase the subject property, and that his advice was based on many factors, one of which was the Drake Sheahan criteria. No testimony was offered to show that the Assistant Postmaster General made his final decision on the basis of any information provided by Burgess.

In our search through the Maryland Reports, we have found no prior decision of this Court presenting a factual situation truly similar to the one at bar. Burgess relies heavily on *Balto. Car Wheel Co. v. Clark, supra*. There, a real estate agent learned that property owned by the Baltimore Car Wheel Company was for sale. He forwarded a prospectus to the real estate representative of the Pennsylvania Railroad who expressed no interest in the property, but subsequently the general manager of the Pennsylvania Railroad negotiated its purchase. The case was tried before a jury, and this Court approved the following instruction:

> " 'The Court instructs the jury that if they shall find from the evidence that the plaintiff was employed by the defendant to make sale of its property referred to and located in Baltimore City, and that the plaintiff submitted said property to the Pennsylvania Railroad Company, and that thereby the said railroad and the defendant were put into communication about it, and that a portion

of said property was thereafter sold to said railroad by the defendant, the plaintiff is entitled to recover such commissions as may have been agreed upon between the plaintiff and the defendant, if the jury shall find that any agreement was made as to the amount of commissions, or such commissions as the jury may believe to be reasonable for the services, if the jury find there was no agreement as to their amount; provided, the jury shall further find that the disclosure to the said railroad by the plaintiff caused the communication by the railroad with the defendant and *was the foundation upon which the negotiation was conducted and the sale made.*' " 131 Md. at 516-17 (emphasis added).

The weakness in the broker's reliance upon that case is that unlike the case at bar, the evidence there established a relationship "between the Real Estate and the General Manager Departments." As one witness described it, the broker's offer " 'was cut and dried at headquarters,' " 131 Md. at 521. Hence, an inference arose that the general manager "was fully advised" by the company's real estate representative of the broker's "connection with the property and what he had said about it in the prospectus." 131 Md. at 521.

We think there is an absence of any showing that the sale was accomplished as the result of the broker's efforts, *Sanders v. Devereux, supra;* nor can it hardly be said that success seemed imminent before Godfrey conducted his investigation, *Sanders v. Devereux, supra.* Therefore, this is ` not a case for the application of the rule that the owner cannot take advantage of a broker's services and make the sale himself so as to deprive the broker of his commission. Moreover, under the facts of this case, the broker's activities were not, as the trial judge found, "the foundation" upon which negotiations were initiated, *Jones v. Adler, supra,* at 443.

In our consideration of this case, we have not been unmindful of the application of Rule 886 which provides:

"When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

The meaningless reference to the *location* of the subject property in the Drake Sheahan study is much too tenuous a link to establish the broker as the "primary, proximate and procuring cause of the sale" made through Godfrey, despite the hotly-contested admission attributed to Malloy that he would pay Burgess the commission. Thus, we hold that the judgment of the circuit court was clearly erroneous.

*Judgment reversed; appellee to pay costs.*